Argued December 8, 1955, reversed January 25, petition
for rehearing denied February 15, 1956

# FURRER v. YEW CREEK LOGGING COMPANY

292 P. 2d 499

*William J. Moshofsky* and *John Gordon Gearin,* of Portland, argued the cause for appellant. With them on the briefs were Koerner, Young, McColloch & Dezendorf, of Portland.

*Bruce Spaulding* argued the cause for respondent. On the brief were Mautz, Souther, Spaulding, Denecke & Kinsey, of Portland.

TOOZE, J.

This is an action to recover for property damage to and loss of use of a lumber truck belonging to plaintiff, Joseph J. Furrer, caused by the alleged negligence of defendant, Yew Creek Logging Co. The case was tried to a jury which returned a verdict for plaintiff

in the sum of $9,738.98. From an order setting aside the verdict and judgment and granting a new trial, plaintiff appeals.

The case arose out of a collision occurring about 3 p. m., June 15, 1951, on state highway 34, which runs between Corvallis and Alsea, in Benton county, Oregon. The truck of plaintiff, a large roll-type lumber truck and tractor, was proceeding in a general westerly direction toward Alsea, and defendant's vehicle, a Ford pickup truck, was approaching from the opposite direction, moving east in the southerly lane of traffic. The highway is some 20 feet wide, with two lanes and gravel shoulders two feet wide on each side. At the time of the accident there was no painted center line, the highway having undergone some recent repairs, but the center was designated by the seam where the asphalt of the two lanes was joined together. The weather was warm and dry.

At a point about three miles east of Alsea the vehicles came together in a side-swipe collision, the left front wheel of the pickup striking the left front dual wheel of the larger truck. Both vehicles were thrown out of control. Defendant's truck rolled over and came to rest at the south edge of the highway some 39 feet from the point of impact, and plaintiff's vehicle was thrown off the north side of the highway and came to rest perpendicular to it on an embankment about 128 feet from the point of collision.

There was a sharp conflict between the parties concerning on which side of the highway's center the collision occured, but there was evidence to support either contention, and the jury evidently concluded that the plaintiff was in his proper lane of traffic at the time.

After the collision plaintiff applied to his insurance carrier, Truck Insurance Exchange, and was given

$4,850, in return for which he signed the following document:

## "LOAN RECEIPT

"$4,850.00                                    20 July 1951

"Received from Truck Insurance Exchange under Policy No. 691596, the sum of FOUR THOUSAND EIGHT HUNDRED FIFTY AND NO/100 DOLLARS, ($4,850.00), solely as a loan and repayable only to the extent of any net recovery that Joseph J. Furrer may make from Yew Creek Lumber Company or Art Adams or from any other person, firm or corporation, on account of or in any way connected with the loss of or damage to a certain Diamond T, Motor No. NHB600-77494, occurring on or about the 15th day of June, 1951, on Highway 34 near Faloma, Oregon.

"As security for such repayment, Joseph J. Furrer hereby pledges to said Truck Insurance Exchange the said recovery, and it [sic] agrees, upon request of said Truck Insurance Exchange, to prosecute a claim or to enter and prosecute suit or action in its [sic] own name against Yew Creek Lumber Company or Art Adams, or such other person, firm or corporation, on account of such claim for loss and damage with all due diligence at the expense of and under the exclusive direction and control of said Truck Insurance Exchange.

"In consideration of the making of the aforesaid loan under the terms and conditions above stated, Joseph J. Furrer does hereby covenant and agree to and with said Truck Insurance Exchange, that it [sic] will neither make any claims nor institute or maintain any proceedings at law or in equity against said Truck Insurance Exchange for the purpose of recovering therefrom with respect to the aforesaid loss or damage.

"Executed in duplicate originals this 20 day of July 1951.

                        "[Sgd.] Joseph J. Furrer."

Defendant filed a plea in abatement and answer to plaintiff's complaint wherein it denied its own negligence, alleged contributory negligence of plaintiff, and contended that this loan was in fact payment by the insurer, and for that reason the insurer was subrogated to the claim of plaintiff, was a real party in interest, and should be joined as a party plaintiff. The plea in abatement was heard by the court and decided contrary to defendant's contention. A trial on the merits was then had, resulting in a verdict and judgment as above stated. Defendant moved for a new trial, assigning as grounds this ruling upon the plea in abatement and six others. The motion was allowed, and from the memorandum opinion of the trial court it is apparent that the sole reason for its allowance was that the court was then of a different opinion concerning the necessity of joining the insurer as a party plaintiff from what it had been at the time it originally considered and denied the plea in abatement.

As a second ground for the motion defendant contends that the court committed error in law when it instructed the jury that there was no law in Oregon limiting the speed of motor vehicles. Defendant's position is that OCLA, § 115-323 (c) (ORS 483.116 (3)) imposes a definite maximum speed of 45 miles per hour upon trucks of the type plaintiff was operating. It contends, therefore, that it was entitled to an instruction to the jury to this effect, because one of the issues in the case made by the pleadings was the question of contributory negligence of plaintiff's driver, based on alleged excessive speed, and that there was evidence tending to show that this alleged maximum speed was exceeded by plaintiff at the time of the accident.

■ Although five additional grounds were presented in defendant's motion, one of which was abandoned

entirely in this court, we feel that they do not present questions which merit discussion here. Two of them assert misconduct on the part of plaintiff's counsel, and the remaining two contend that the damages were based upon insufficient evidence. An examination of the record shows that these contentions are not well taken.

Turning our attention first to the "loan receipt," the effect of which is the principal bone of contention on this appeal, it appears that the questions raised concerning it are matters of first impression in this state, although courts of other jurisdictions, both state and federal, have dealt with them on numerous occasions.

Some of these courts criticize the loan receipts and the motives of parties using them, holding them to be a subterfuge and a sham, disguising the true character of the transaction between insured and insurer. *Purdy v. McGarrity,* 262 App Div 623, 30 NYS2d 966; *Scarborough v. Bartholomew,* 263 App Div 765, 30 NYS2d 971; *Yezek v. Delaware L. & W.R. Co.,* 176 Misc 553, 28 NYS2d 35; *Cleveland Paint & Color Co. v. Bauer Mfg. Co.,* 155 Ohio St 17, 97 NE2d 545; *Demming v. Merchants' Cotton-press & Storage Co.,* 90 Tenn 306, 17 SW 89; *Lancaster Mills v. Merchants' Cotton-press & Storage Co.,* 89 Tenn 1, 14 SW 317, 24 Am St Rep 586. Also see *Alliance Ins. Co. v. Capital National Bank,* 75 Cal App2d 787, 171 P 449; 1 ALR 1528, 132 ALR 607, 157 ALR 1261.

Others, however, feel that these agreements should be enforced to the extent contemplated by the parties, and when a loan is intended, that effect will be given to them. *Luckenbach v. W. J. McCahan Sugar Refining Co.,* 248 US 139, 63 L ed 170, 39 S Ct 53, 1 ALR 1522; *Dixey v. Federal Compress and Warehouse Co.,* 132 F2d 275; *Kossmehl v. Miller National Insurance*

*Co.*, 238 Mo App 671, 185 SW2d 293. On some occasions courts, while purporting to follow the Luckenbach case, supra, in passing favorably on a loan receipt transaction, fail to acknowledge the element of the intention of the parties discussed there and seem to hold that the giving of a loan receipt necessarily impels the conclusion that a loan rather than a payment was made.

■ It is true that many of the cases which approve of such agreements may be distinguished one from the other, and from the case at bar, and therefore some of the reasons stated in them do not have so persuasive an effect here as there. However, without an extensive discussion of the rather large body of authority on either side of the question, we hold that there is nothing inherently wrong with the use of a loan receipt in the manner and to the effect employed here. We feel that where, as in this case, the loan receipt is given with the intention that the money received under it shall be a loan and not a payment, such an intention should be given effect. And it would seem that the giving of the receipt, containing recitals such as the one here involved, is strong evidence of the true intention of the parties that there has been no payment and that the title to the cause of action therefore did not pass from plaintiff to his insurer.

■ The insurer may have an action against defendant only if it makes an outright payment to plaintiff and becomes thereby subrogated to plaintiff's rights. *Salzwedel v. Pinkley,* 140 Or 671, 15 P2d 718; *Olds v. Von der Hellen et al.,* 127 Or 276, 263 P 907, 270 P 497; *Home Mutual Ins. Co. v. O. R. & N. Co.,* 20 Or 569, 26 P 857. If the insurer prefers to forego that right and to substitute for it a contract right against plaintiff, defendant need have no fear of an action by the insurer, for it will have none. The insurer cannot

make a loan and claim to be subrogated, and unless it can show a right by subrogation it cannot harass defendant by an action on the claim.

■ Of course, defendant is entitled to assurance that it will be required to defend against this claim only once, and that payment to plaintiff will, as to it, finally settle the matter. However, this is the extent of the interest which defendant may have in any agreement of this kind, made, as it is, between two other parties who are free to contract in any lawful manner concerning their business. If plaintiff chooses to take something less than the absolute payment to which he is entitled under this policy, that is his affair, and defendant's only proper concern is that payment to plaintiff is the only one which will be required of it.

The reason why these parties chose to adopt this arrangement is immaterial so far as defendant is concerned, for he is properly concerned with only one effect of it—the location of the title to the cause of action.

■ Indeed it would be difficult for the insurer to claim that it could bring this action after it has procured a document such as this. The entire tenor of the loan receipt shows that the insurer intended that the title to the claim should remain in plaintiff. To be sure, the insurer will have some interest in the fund recovered, but the interest will come not from a subrogation because of a payment it has made, but from the agreement which it has entered into with plaintiff. The case of *Blair v. Espeland,* 231 Minn 444, 43 NW2d 274, 277, is a case substantially similar to the one before us, and the court stated:

"* * * The arrangement between plaintiff and his insurer cannot affect defendant financially. Therefore, he need not be concerned. * * * Where

defendant is not legally affected, he cannot interfere with the freedom of plaintiff and his insurer to contract, through the device of a 'loan receipt' agreement, that the title to the cause of action against a wrongdoer reside wherever they determine by their agreement.''

We think that this decision presents a sound and correct interpretation of the law applicable in this case. See also *Capo v. CO Two Fire Equipment Co.,* 93 F Supp 4; and *Phillips v. Clifton Mfg. Co.,* 204 SC 496, 30 SE2d 146, 157 ALR 1255. A more or less complete discussion of this question appears in the note appended to this latter decision in 157 ALR 1261, supra.

■ The remaining question for decision is whether it was error for the court to instruct the jury that there was no maximum speed limit for motor vehicles in this state. Though there is, as defendant contends, a maximum speed limit applicable to plaintiff's truck, still we think that it was immaterial in this case, and that defendant was therefore not prejudiced by the action of the court in ignoring it. We cannot see how, under the facts of this case, plaintiff's driving at a speed in excess of the alleged limitation could be the proximate cause of this collision. The vital and only real issue on the trial was as to which party was on the wrong side of the road, and it was determined that defendant came into plaintiff's lane of travel and that the collision occurred there. In such a situation the cause of the accident was this negligence of defendant, and plaintiff's speed was immaterial. The case of *Erdman v. Inman,* 165 Or 590, 109 P2d 593, dealt with a similar problem, except that the instruction on speed was given and defendant asserted error. The court held that the instruction was improper, but that because

of others given, no prejudicial error was committed. In the course of the opinion it was said:

> "Obviously if defendant had been driving on his right side of the highway, there could have been no collision unless plaintiff drove onto his wrong side. Under such circumstances, the speed at which the defendant was traveling was immaterial and could not possibly have been the proximate cause of the accident."

Also see *Ambrose v. Young,* 100 W Va 452, 130 SE 810; and *Arundel v. Turk,* 16 Cal App2d 293, 60 P2d 486. This is not to say that situations could never arise where speed of the innocent party in a head-on collision would be material and bear upon the question of contributory negligence. Under the facts and circumstances of this particular case, however, the question of speed was immaterial, and no prejudicial or reversible error was committed.

The judgment is reversed and this cause remanded with directions to reinstate the verdict and judgment.