Argued and submitted March 8, reversed and remanded in part; otherwise
affirmed June 7, 2000

## METROPOLITAN PROPERTY & CASUALTY,
### a corporation,
*Appellant,*

*v.*

## John S. HARPER,
### an individual, dba Nomad Designs;
### and All City Electric, Inc.,
### an Oregon corporation,
*Respondents.*

### (97CV0645; CA A104220)

7 P3d 541

Glenn Barger argued the cause for appellant. On the brief were Stephen L. Madkour and Smith, Freed, Heald & Chock, P.C.

James A. Wallan argued the cause for respondent John S. Harper, dba Nomad Designs. With him on the brief were Benjamin M. Bloom and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Mark D. Clarke argued the cause for respondent All City Electric, Inc. With him on the brief were Frederick H. Lundblade and Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P.C.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

Plaintiff Metropolitan Property and Casualty (Metropolitan) appeals from a final judgment entered in this breach of contract and negligence action, arising from a fire that destroyed its insureds' residence. Metropolitan asserts that the trial court erred in granting partial summary judgment in favor of defendant All City Electric, Inc. (All City), in directing verdicts in defendants' favor on Metropolitan's remaining claims, and in granting defendants' motion to substitute Metropolitan as plaintiff in place of its insureds. We affirm in part and reverse and remand in part.

In 1994, Michael and Nancy Holcomb purchased a house in Gold Beach and procured a homeowners insurance policy from Metropolitan covering the residence. In August 1994, the Holcombs entered into a written contract with defendant John S. Harper, a general building contractor, to make various structural modifications and to renovate the electrical and plumbing systems of the residence. Harper subcontracted the electrical work to All City. In late November or early December, Harper asked All City to provide a space heater in order to facilitate the drying of newly hung sheetrock. All City delivered and connected a heater directly to the circuit panel in the basement. Harper used the heater almost continuously for 24 hours a day during the three weeks leading up to December 31. In the early morning hours of December 31, a fire destroyed the residence. The Holcombs made a claim for the resulting loss on their homeowners policy, and Metropolitan paid the claim. As part of the consideration for settlement of the claim, the Holcombs executed a written agreement releasing Metropolitan from any potential claims arising from the fire and subrogating to Metropolitan their rights against third parties relating to the fire.

In November 1997, Metropolitan filed this action against defendants in the Holcombs' name, alleging that defendants negligently caused the fire. The amended complaint alleged:

"On or about December 31, 1994, a fire caused damage to [the Holcombs'] property. The cause of the fire was the negligence of defendants Harper * * * and All City Electric,

in that they failed to exercise reasonable care in one or more of the following:

"(a) In placing an electrical heater too close to combustibles;

"(b) In failing to inspect, or monitor the heater to ensure that it could be operated safely;

"(c) In leaving the premises and the heater unattended and unsupervised while the heater remained operating;

"(d) In failing to ensure that the heater was property equipped with a thermostat to prevent the unit from overheating;

"(e) In failing to ensure that the heater was property [*sic*] placed to prevent the heater from tipping over;

"(f) In failing to ensure that the heater was property [*sic*] equipped with a 'trip-switch' to prevent the heater from operating if it has tipped over;

"(g) In failing to properly connect the heater to the electrical panel and by using an inappropriate breaker to power the heater."

Before trial, All City moved for summary judgment with respect to all specifications of negligence asserted against it in the amended complaint. While that motion was pending, Harper and All City each moved for an order substituting Metropolitan as the party plaintiff. Metropolitan also moved for leave to file a second amended complaint that, among other changes, included a breach of contract claim against Harper based on a provision in Harper's written agreement with the Holcombs stating that "[c]onstruction will be completed in a timely and workmanlike manner * * *." The trial court granted summary judgment in All City's favor on all specifications of negligence except for subparagraph (a), substituted Metropolitan for the Holcombs as plaintiff, and granted Metropolitan's motion to amend its complaint.[1]

---

[1] In addition to alleging the breach of contract claim against Harper, Metropolitan made various changes to its specifications of negligence against defendants in its second amended complaint. The parties did not discuss them in the summary judgment proceeding and do not mention them on appeal. We express no opinion concerning their effect, if any.

At the conclusion of Metropolitan's case-in-chief at trial, Harper moved for a directed verdict on the contract claim, arguing that the contract claim was, in reality, a disguised tort claim and, therefore, did not state a separate claim for breach of contract. The trial court granted the motion. Both defendants then moved for a directed verdict on Metropolitan's remaining negligence specifications. The trial court also granted those motions, concluding that "[Metropolitan] had failed to offer legally sufficient evidence of causation to submit [those] claim[s] to the jury." The court entered final judgment in accordance with its rulings.

■■ On appeal, Metropolitan first argues that the trial court erred in granting partial summary judgment to All City with respect to the specifications of negligence contained in subparagraphs (b) through (g) of the amended complaint. We assess the summary judgment record in the light most favorable to the nonmoving party in order to determine whether a genuine issue of material fact exists and, if not, whether the moving party was entitled to judgment as a matter of law. ORCP 47 C (1997);[2] *See Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997). The summary judgment record includes affidavits and other evidence in support of, and in opposition to, the motion. *Id.* at 412.

In opposing summary judgment, Metropolitan submitted an affidavit pursuant to ORCP 47 E, wherein its attorney stated that "[Metropolitan has] retained an unnamed qualified expert who is available and willing to testify to admissible facts or opinions creating a question of fact." Metropolitan contends that the affidavit created genuine issues of material fact with respect to each of the negligence specifications, thus precluding summary judgment. All City responds that the affidavit created triable issues of fact with respect to subparagraph (a) only.

■■ ORCP 47 E permits a party to avoid summary judgment on any genuine issue of material fact that may be proved by expert opinion evidence, by submitting an affidavit from the party's attorney stating that an "expert has been

---

[2] In 1999, the legislature amended ORCP 47 C. *See* Or Laws 1999, ch 815, § 2. Neither party raises, and we do not address, the effect of that amendment. *See Graham v. State of Oregon*, 164 Or App 747, 758 n 5, 995 P2d 1167 (2000).

retained and is available and willing to testify to admissible facts or opinions that would create a question of fact." *Brownstein, Rask, Arenz v. Pearson*, 166 Or App 120, 125, 997 P2d 300 (2000) (quoting *Moore v. Kaiser Permanente*, 91 Or App 262, 265, 754 P2d 615, *rev den* 306 Or 661 (1988)). *Accord Stotler v. MTD Products, Inc.*, 149 Or App 405, 943 P2d 220 (1997). Unless the affidavit specifies otherwise, the trial court must presume that the expert will testify on every issue on which summary judgment is sought. *Id.* at 409. However, if the party chooses to "enumerate the issues on which the expert will testify * * * the enumeration must give notice of *all* elements on which an expert may testify" because the opposing party and the trial court may otherwise reasonably infer that there will be no expert testimony on other elements. *Moore*, 91 Or App at 265.

■ As noted, the attorney's affidavit averred that Metropolitan had "retained an unnamed qualified expert who is available and willing to testify to admissible facts or opinions creating a question of fact." The affidavit did not enumerate the issues on which the expert would testify; thus, the trial court was entitled to infer that Metropolitan's expert would testify to material facts relating to each of the specifications of negligence in the amended complaint. Notwithstanding its breadth, All City asserts that the affidavit's effect was limited by Metropolitan's memorandum opposing summary judgment because the memorandum specifically enumerated the issues on which the expert would testify and did not refer to the allegations in subparagraphs (b) through (g) of the amended complaint. We disagree.

Metropolitan referred to the affidavit in its memorandum only once, stating that, "plaintiffs submit their attorney's affidavit pursuant to ORCP 47 E, stating that plaintiffs are prepared to submit expert testimony stating that the heater was placed too close to combustibles." All City's attorney asserted in the summary judgment hearing that

"[t]he evidence is that their expert will testify—I think they cited in this in their response—regarding placement of the heater near combustibles. That goes to [a]llegation—their first allegation under [subparagraph (a)].

"So \* \* \* if the [c]ourt finds that they've offered some genuine issue of material fact based upon their expert testimony on [subparagraph (a)], I think partial summary judgment might be appropriate in [s]ubparagraphs (b) through (g)."

In response, Metropolitan's attorney argued that

"[t]he attorney affidavit submitted in compliance with ORCP 47 E states that we have retained an unnamed qualified expert who is available and willing to testify to admissible facts or opinions creating a question of fact.

"That basically mirrors the language of the rule itself and *we certainly have experts on board who are going to testify concerning more than just the placement of the heater* and more than just the heater's being the alleged source of the cause and source of the fire but also the manner in which the heater was connected.

"*So we believe that each and every allegation set forth in the complaint as it currently is drafted should remain.*" (Emphasis added.)

Assuming, without deciding, that a party's memorandum can circumscribe the inferences that might otherwise fairly be drawn from its ORCP 47 E affidavit, we disagree that Metropolitan so limited its attorney's affidavit in this case. Any uncertainty created by the memorandum was eliminated by counsel's argument at the summary judgment hearing. Viewing the record, as we must, in the light most favorable to Metropolitan, we conclude that the affidavit raised issues of material fact with respect to each of the specifications of negligence contained in subparagraphs (b) through (g).

■ All City argues that summary judgment was nonetheless appropriate on the specifications of negligence contained in subparagraphs (b), (c) and (e), because expert testimony would not have assisted the jury on those specifications and because "[Metropolitan] offered no other facts to create material issues of fact." All City does not challenge the use of expert testimony to create genuine issues of material fact with respect to subparagraphs (d), (f), and (g), nor does it offer any other colorable basis to uphold summary judgment

with respect to those specifications.[3] Therefore, we conclude that the trial court erred in granting summary judgment as to those specifications of negligence. For the following reasons, we also conclude that genuine issues of material fact existed with respect to subparagraphs (b), (c), and (e).

All City submitted deposition excerpts and an affidavit from its owner, Ron Cook, together with excerpts from Harper's deposition. In opposition, Metropolitan submitted its attorney's ORCP 47 E affidavit and additional excerpts from Cook's deposition. That evidence, when viewed in its entirety, presented the following series of events.

In accordance with Harper's request, All City provided a space heater for use at the house. The type of heater that All City provided was a "ceiling mount—or wall mount" heater that an All City employee "hard wired * * * to a breaker" in the house. Because the heater was designed for mounting on a ceiling or wall, it did not have a "trip switch" that shut off the heater if it was accidently knocked over. The heater also did not have a "control knob" or an "on-and-off switch." Notwithstanding the absence of such features, All City placed the heater on the ground about five or six feet from the base of the stairs and directed it toward the stairs. Cook personally inspected the heater and "found it to be connected properly." The heater was in operation when Cook inspected it, and he did not have "any activity with the heater after that point."

The foregoing evidence, coupled with the ORCP 47 E affidavit, created genuine issues of material fact regarding All City's alleged negligence in subparagraphs (b), (c), and (e)—that is, in "failing to inspect, or monitor the heater to ensure that it could be operated safely," in "leaving the premises and the heater unattended and unsupervised while the

---

[1] All City does argue that it was entitled to summary judgment on subparagraphs (d) and (f) because those specifications in substance alleged "negligent design of the heater" and therefore constituted product liability claims under ORS 30.900 to ORS 30.927. Assuming without deciding that product liability claims could not be pursued against All City, we conclude that Metropolitan did not allege negligent design of the heater; instead, it alleged that All City was negligent in *using the heater as designed* in the manner it did. Metropolitan did not assert a product liability claim, and All City was not entitled to summary judgment on that basis.

heater remained operating," and in "failing to ensure that the heater was property [*sic*] placed to prevent the heater from tipping over." Contrary to All City's argument, expert testimony would assist a factfinder in deciding whether the conduct complained of in those specifications fell below the relevant standard of care. *See State v. Brown*, 297 Or 404, 409, 687 P2d 751 (1984) (expert testimony is admissible if it is relevant and helpful to the trier of fact). A finder of fact could reasonably conclude, based on an expert's opinion to that effect, that All City was negligent in leaving a heater in such a condition for constant operation in a building that was being remodeled. Thus, the trial court erred in granting partial summary judgment on the specifications alleged in subparagraphs (b), (c), and (e).

 Metropolitan next argues that the trial court erred in directing a verdict on its breach of contract claim against Harper. In response, Harper points to the provision in his contract with the Holcombs that "construction will be completed in a timely and workmanlike manner." He asserts that the trial court properly entered a directed verdict because "the breach of contract claim * * * was, in actuality, a tort claim," and, thus, did not support an independent claim for breach of contract. In reviewing a directed verdict, we view the evidence in the light most favorable to the nonmoving party—in this case Metropolitan—and extend to that party the benefit of every inference that may be drawn from the evidence. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). A directed verdict is appropriate only if the moving party is entitled to judgment as a matter of law. *Lindstrand v. Transamerica Title Ins. Co.*, 127 Or App 693, 695, 874 P2d 82 (1994).

 In *Georgetown Realty, Inc. v. Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992), the Supreme Court distinguished between contract claims and tort claims that arise among parties to a contract, for purposes of determining the appropriate statute of limitations. The court stated that if

> "the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the

injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation." *Id.* at 106.

In reaching its conclusion, the court in *Georgetown Realty* relied in part on its earlier decision in *Securities-Intermountain, Inc. v. Sunset Fuel Co.*, 289 Or 243, 611 P2d 1158 (1980). *Georgetown Realty, Inc.*, 313 Or at 105-06. In *Securities-Intermountain*, the court held the following:

> "*If the alleged contract merely incorporates* by reference or by implication a *general standard of skill and care* to which the defendant would be bound independent of the contract, and *the alleged breach would also be a breach of this non-contractual duty, then ORS 12.110 [the tort statute of limitations] applies. Conversely, the parties may have spelled out the performance* expected by the plaintiff and promised by the defendant in terms that commit the defendant to this performance *without reference to and irrespective of any general standard. Such a defendant would be liable on the contract* whether he was negligent or not, and regardless of facts that might excuse him from tort liability." *Id.* at 259 (emphasis added; citations omitted).

Harper argues that Metropolitan "failed to allege a separate contract claim" because "the contract in question did nothing more than incorporate the general standard of care to which any contractor would be held." In essence, Harper contends that even if contracting parties bargain with reference to a generalized standard of care for performance, a violation of that provision does not give rise to a claim for breach of contract; instead, the aggrieved party is limited to a tort remedy. We disagree that *Georgetown Realty* and *Securities-Intermountain* stand for such a proposition.

In both cases, the question before the court was not whether an aggrieved party may enforce a contract that requires performance in accordance with a general standard of care but was, instead, whether the two-year statute of limitations for tort actions, ORS 12.110, applied to the plaintiffs' breach of contract claims. That issue arises only when a

defending party challenges the timeliness of an action on a contract theory brought after "the first two years." *Securities-Intermountain*, 289 Or at 258-59. We are not called on to address it here, because Harper challenges the permissibility of an alternative claim for breach of contract *irrespective of its timeliness*.

■ ■ Both *Georgetown Realty* and *Securities-Intermountain* expressly endorse the freedom of contracting parties to create contractual remedies for conduct that would otherwise constitute a tort. In *Securities-Intermountain*, the court stated that "contracting parties are free to specify services and standards of performance that may overlap noncontractual duties" and that a breach of contract action is not defeated "by asserting that, independent of the contract, [the conduct] constituted a tort." 289 Or at 258-59. Similarly, the *Georgetown Realty* court acknowledged that "a party may be able to rely on either a contract theory or a tort theory *or both*." 313 Or at 106 (emphasis added). *See also Fessler v. Quinn*, 143 Or App 397, 400, 923 P2d 1294 (1996) (an identical factual setting may give rise to both a contract theory and a tort theory). In short, contracting parties are entitled to enforce commitments to perform contractual obligations in accordance with a general standard of care.

■ As *Securities-Intermountain* recognized, however, the amount of damages sought must be consistent with the theory pleaded. 289 Or at 260. Here, Metropolitan sought damages on the contract claim in the amount of its expectancy "had [the] contract been fulfilled." Those damages, if proven, are recoverable in a breach of contract claim. *See Smith v. Pallay*, 130 Or 282, 279 P2d 279 (1929) (injured party is entitled to all damages which flow from the breach in the natural course of events or which may reasonably be presumed to have been contemplated by the parties at the time of contract formation). Therefore, the trial court erred in directing a verdict in Harper's favor on the breach of contract claim.

■ Metropolitan next contends that the trial court erred in directing a verdict for defendants on its negligence claim based on the rationale that Metropolitan failed to offer "sufficient evidence to submit the questions of causation to the

jury." A directed verdict was appropriate if we can affirmatively say that there is *no evidence* from which the jury could have found the facts necessary to establish the element of causation. *See Brown*, 297 Or at 705.

In order to establish the cause of the fire, Metropolitan primarily relied on expert testimony from John Powell, a fire investigation expert, and a written report produced by Powell's employee, Robert Evans, who personally investigated the fire. That report itself was introduced into evidence and stated, in part:

### "FIRE SCENE EXAMINATION

"[Evans] examined the bottom of the stairway in the basement. After removing the damaged beams, floor joists, and roofing, the heavily damaged steel remains of the 220 volt electric portable heater were located. [T]he stranded three wire pigtail and connecting solid strand 10-2 NMB and ground were located. It had been connected to the electric service panel on the south wall of the basement.

"The stair treads and jacks were examined to reveal the almost total destruction of the first treads on the stairs. Each tread was constructed of two 2 x 6 pieces of fir. * * *.

"The treads themselves were more heavily burned from the bottom side than from the top. The concave burn pattern to the first three treads clearly indicates a heat source located at the south end of the steps. A tape measure, placed from the edge of the heater remains to the location of the missing first riser, indicated a distance of about sixteen to seventeen inches. * * *. Three feet west of the bottom of the stairway, a short wall still had 2 x 4's with only slight fire damage when compared to the other heavy destruction. Burn patterns indicate fire travel came from the front of the heater facing up the stairs, rather than the west wall behind the heater.

"* * * * *

### "CONCLUSION

"*[T]he fire most probably resulted from ignition of combustible material by the portable electric heater.* Although remains of the heater were approximately sixteen to seventeen inches from the stairs after the fire, we cannot rely

on that separation as having been present prior to the fire. Several witnesses described that the heater 'Put out a lot of heat and ran only on high.'

"Due to the almost complete destruction of the house, we cannot eliminate the possibility of other combustible materials being in close contact with the heater or an accidental disturbance of the heater, directing its output toward the lower treads." (Emphasis added.)

On direct examination, Powell testified that he did not personally investigate the scene but that he had reviewed the Evans report, its supporting photographic evidence, and concurred with the report's analysis and conclusion. When asked "[B]ottom line, what's the conclusion of that report?" Powell replied:

"The *conclusion of the report is that more probable than not the fire originated in the basement*; that's the area to which the major components of the house collapsed and that *the fire involved, more likely than not, the electric heater in the basement* at the time of the fire." (Emphasis added.)

Powell also testified that "other potential sources [of the fire] were looked for * * * and ruled out." Finally, in response to the question "[w]hat is your basic conclusion as to the cause of this fire?," Powell stated that, "My conclusion is that the heater and/or its wiring were involved in the origin of the fire. The fire originated in that area and that those items were the sole potential source of ignition for the fire."

On cross examination, Powell agreed that the report did not "indicate that the electrical hookup of [the] * * * heater was in any way involved in the fire." However, he did testify that the electrical connection and wiring created a "fire hazard" and a "potential ignition source." Powell also could not rule out the "possibility" of embers from an unknown source falling under the stairs and igniting them, thereby creating burn patterns like the ones described in the report.

■ Viewing the evidence in the light most favorable to Metropolitan, we conclude that Powell's testimony and the report were sufficient to permit a jury to reasonably infer that the fire occurred as the result of: (1) placing the heater too close to combustibles; (2) failing to inspect or monitor the

heater to ensure that it could be operated safely; and (3) leaving the premises and the heater unattended and unsupervised while the heater remained in operation. The *causation* element for each of those related specifications of negligence was supported directly or inferentially by Powell's testimony that the placement and operation of the heater probably caused the fire. Although Powell equivocated somewhat on cross-examination, our role in reviewing the grant of a directed verdict is not to weigh the evidence; that is the jury's function. *See Johnson v. Jeppe*, 73 Or App 430, 436-37, 698 P2d 1020 (1985). Thus, the trial court erred in directing a verdict in defendants' favor with respect to subparagraph (a) and in Harper's favor on subparagraphs (b) and (c).

As to subparagraphs (d) through (f), there was no evidence that the lack of a thermostat caused the heater to overheat, nor was there any evidence that the heater tipped over. Finally, as to subparagraph (g), there was no evidence that failing to connect the heater properly to the electrical panel caused anything other than the creation of a "fire hazard" or another "potential ignition source." There was no evidence that the hazard, in fact, caused the fire. Metropolitan nonetheless contends that its evidence relating to those specifications of negligence was sufficient to survive a directed verdict under the doctrine of *res ipsa loquitur*.

■ *Res ipsa loquitur* is a rule of circumstantial evidence that permits a jury to infer both negligence and causation if the harm that occurs is " 'of a kind that which more probably than not would not have occurred in the absence of negligence on the part of the defendant.' " *McKee Electric Co. v. Carson Oil Co.*, 301 Or 339, 353, 723 P2d 288 (1986) (quoting *Watzig v. Tobin*, 292 Or 645, 649, 642 P2d 651 (1982)); *Fieux v. Cardiovascular & Thoracic Clinic, P.C.*, 159 Or App 637, 640, 978 P2d 429, *rev den* 329 Or 318 (1999). Metropolitan argues that *res ipsa loquitur* applies here, reasoning that "fires usually do not occur unless someone is negligent and that the negligence, more probably than not, [is] attributed to the conduct" of Harper.

■■ With respect to subparagraphs (d), (e), and (f), there was no evidence establishing that the heater either overheated or tipped over. *Res ipsa loquitur* does not save those

specifications from a directed verdict because it does not permit an inference that any of their factual predicates existed. In other words, a jury could not infer that overheating or tipping over "more probably than not" caused the fire because there is no evidence that either event occurred. As to subparagraph (g), on the other hand, there is evidence that the improperly connected heater resulted in a "fire hazard." We must therefore determine whether a jury could reasonably infer that the improper electrical connection probably caused the fire.

■ Contrary to Metropolitan's assertion, *res ipsa loquitur* is not commonly applied to fires, because " '[t]he cause of a fire is generally unknown, fires commonly occur where due care has been exercised as well as where due care was wanting.' " *Waterway Terminals v. P.S. Lord*, 242 Or 1, 54, 406 P2d 556 (1965) (quoting *Menth v. Breeze Corporation, Inc.*, 4 NJ 428, 435-36, 73 A2d 183, 18 ALR2d 1071). Our decision in *Umpqua Aquaculture, Inc. v. Ron's Welding*, 111 Or App 220, 225, 826 P2d 31 (1992), illustrates the limits of the doctrine in circumstances similar to those present here. There, the plaintiffs were tenants in a building that caught fire during renovation. The plaintiffs argued that the cause of the fire could be inferred circumstantially with the aid of *res ipsa loquitur*. We disagreed, concluding that, in order for *res ipsa loquitur* to apply, the plaintiffs had to show that an electrical fire was "unlikely to occur in the absence of *someone's* negligence." *Id.* (emphasis in original). Although the plaintiffs produced some evidence that the fire in question was caused by the defendant, because the evidence did not also show that such a fire was unlikely to occur in the absence of negligence, it was insufficient to create a jury issue under *res ipsa loquitur*. *Id.*

Here, too, Metropolitan focuses on evidence relating to the cause of the fire. It emphasizes expert testimony at trial that essayed to eliminate other potential causes of the fire, ranging from criminal activity to "oily rags." However, it points to no evidence, and we find none, showing that the fire was unlikely to occur in the absence of negligence. As in *Umpqua Aquaculture*,

"[t]he evidence to which plaintiffs point for the proposition that the fire was *unlikely* to occur in the absence of negligence does not support that proposition but relates instead to the question of whether the specific facts adduced show that the fire *was* caused by defendants' negligence." *Id.* (emphasis in original).

Therefore, *res ipsa loquitur* is of no assistance to Metropolitan and we conclude that the trial court did not err in directing a verdict on subparagraph (g).

Metropolitan's final two assignments of error address its contention that the trial court erred in granting defendants' motion to substitute Metropolitan as plaintiff in the action. Metropolitan first argues that its "release and subrogation agreement" with the Holcombs was a "proper means of preserving [the Holcombs'] title" to the claims against defendants and that the trial court erred in concluding otherwise. Alternatively, Metropolitan asserts that even if it became the real party in interest as a result of paying the claim, the ratification it filed in the trial court pursuant to ORCP 26 A, authorized it to proceed in the names of the Holcombs. We discuss each argument in turn.

An insurer who makes an outright payment to its insured is subrogated to the insured's claims arising from the loss for which payment was made. *Furrer v. Yew Creek Logging Co.*, 206 Or 382, 388, 292 P2d 499 (1956); *Growers Refrigeration v. Pacific Electrical*, 165 Or App 274, 276, 996 P2d 521 (2000). A subrogated insurer becomes the owner of the claim and the real party in interest in any action to enforce it. *Id.* The Oregon Rules of Civil Procedure require that "[e]very action shall be prosecuted in the name of the real party in interest." ORCP 26 A. That rule assures a defending party that it will be required to defend against a claim only once. *Growers Refrigeration, id.* at 277. Metropolitan asserts that it is not the real party in interest, because its payment to the Holcombs merely constituted a *loan* and, as such, did not effect a transfer of ownership of the claims against defendants.

An insurer who makes a loan to its insured is not subrogated to the insured's claims because there has been no outright payment that effectively transfers title to the claim

from the insured to the insurer. *Furrer*, 206 Or at 388; *Growers Refrigeration*, 165 Or App at 276. Thus, a valid loan receipt documents the parties' intent to authorize an insurer to proceed with an action against third parties in the name of the insured where, in fact, the claim still belongs to the insured. *See Waterway Terminals*, 242 Or at 7.

The receipt in this case provided, in part:

"RELEASE AND SUBROGATION RECEIPT

"* * * * *

*"RECEIVED*
*of the [Metropolitan] * * * the sum of * * * in full payment,* release and discharge of all claims and demands of the [Holcombs] against [Metropolitan], arising from or connected with any loss or damage by reason of FIRE

which loss or damage arose or occurred on or about the 31ST day of DECEMBER, 1994, and in full payment, release and discharge of all claims and demands against [Metropolitan] * * *.

"*In consideration of and to the extent of said payment the [Holcombs] hereby subrogates [Metropolitan], to all of the rights, claims and interest which the undersigned may have against any party, person, persons, property or corporation liable for the loss mentioned above, and authorizes [Metropolitan] to sue, compromise or settle in the [Holcombs'] name* or otherwise all such claims and to execute and sign releases and acquittances and endorse checks or drafts given in settlement of such claims in the name of the [Holcombs], with the same force and effect as if the [Holcombs] executed or endorsed them." (Emphasis added.)

We disagree, for two reasons, that the foregoing document suffices to evidence a loan receipt. First, it plainly shows that the parties intended the payment to constitute "full payment" of the Holcombs' claim arising from the fire. The receipt contains *no* language suggesting that the parties intended a loan repayable only to the extent that the Holcombs obtained a judgment against any party arising from the fire. Second, the receipt expressly subrogated Metropolitan to all of the Holcombs' rights arising from the fire. Although the receipt purported to authorize Metropolitan to "sue" in the

Holcombs' names, it did not reserve "ownership" of the claim to the Holcombs. In short, the document did not constitute a loan receipt; it was a receipt for payment of the claim. As a result, Metropolitan became the real party in interest after paying the claim, and the trial court did not err in so concluding. We therefore turn to Metropolitan's argument that the ratification it filed in the trial court pursuant to ORCP 26 A nonetheless authorized it to proceed in the Holcombs' name.

■ Although ORCP 26 A generally provides that actions must be pursued in the name of the real party in interest, the same rule provides that

> "*[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed* after objection *for ratification of commencement of the action by*, or joinder or substitution of, *the real party in interest*; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."

We have previously observed that the "principal area of application" of the ratification exception to the real party in interest rule arises "where an insurer who has paid all or part of a claim is subrogated to its insured's right of recovery but does not want to pursue the action in its own name." *Jensen v. Alley*, 128 Or App 673, 679, 877 P2d 108, *rev den* 320 Or 272 (1994). In such situations, the insurer may file a certificate, stating that the named plaintiff is authorized to prosecute the action *and* that the insurer agrees to be bound by the final determination of the case. *Id.* The defendant's interest in not being subjected to multiple actions is protected because the real party in interest is bound by the final judgment.

■ Harper and All City jointly moved to substitute Metropolitan as the real party in interest on September 21, 1998. At the same time Harper sought expedited consideration of the motion. Metropolitan filed its response to the motion on September 25. In its response, Metropolitan advanced only its loan receipt argument; it did not raise the ratification issue. A telephonic hearing was held on the motion, and Metropolitan again advanced only the loan

receipt argument. The court took the motion under advisement. On September 28, the court issued a letter opinion concluding that "[t]itle to the claim is with the insurance company and it will be substituted in as the real party in interest." In the same letter, the court directed Harper to prepare an order documenting that ruling. Metropolitan did not file the ratification until October 1, three days after the court decided the motion. The order granting the motion was entered on October 9.

Implicit in Metropolitan's argument is an assumption that the late filing of the ratification required the trial court to reconsider its September 28 ruling. We disagree. The motion was decided when the trial court issued its letter opinion; the court was not required, *sua sponte*, to consider the effect of the untimely filed ratification. Accordingly, the trial court did not err in granting defendants' motion for substitution.

In conclusion, Metropolitan is entitled on remand to reinstatement of specifications (b) through (g) of its negligence claim against All City and to a new trial with respect to specification (a) of its negligence claim against All City. With respect to Harper, Metropolitan is entitled to a new trial on its breach of contract claim and on specifications (a), (b) and (c) of its negligence claim.

Summary judgment reversed and remanded; directed verdict on Metropolitan's contract claim against Harper reversed and remanded for new trial; directed verdict in All City's favor on Metropolitan's negligence specification in subparagraph (a) reversed and remanded for new trial; directed verdict in Harper's favor on Metropolitan's negligence specifications subparagraphs (a), (b), and (c) reversed and remanded for new trial; otherwise affirmed.