Argued and submitted May 7, reversed and remanded September 9, 2021

Gregory NELSON
and Ronda Nelson,
*Plaintiffs-Respondents,*

*v.*

LIBERTY INSURANCE CORPORATION,
*Defendant-Appellant.*

Josephine County Circuit Court
17CV04403; A171345

498 P3d 861

After their property was damaged in a fire that started at a nearby lumber mill, plaintiffs pursued contract claims against their homeowner's insurer, defendant Liberty Mutual Insurance Company, and negligence and other claims against the lumber mill. Plaintiffs reached a settlement with the lumber mill and released it from all claims. After learning of the settlement, defendant asserted an affirmative defense to plaintiffs' contract claims based on plaintiffs' interference with defendant's subrogation rights. The trial court granted summary judgment for plaintiffs on the affirmative defense, on the basis that defendant was equitably estopped from asserting its subrogation rights. The case proceeded to trial and resulted in a $10,000 verdict for plaintiffs. Defendant appeals the resulting general judgment, assigning error to the summary judgment ruling on its subrogation defense, and a related supplemental judgment for attorney fees, costs, and prejudgment interest. *Held*: The trial court erred in concluding that no objectively reasonable juror could return a verdict for defendant on its subrogation defense. The summary judgment record establishes a genuine issue of fact as to whether defendant was silent when it had a duty to speak, as relevant to the first element of equitable estoppel.

Reversed and remanded.

Robert S. Bain, Judge.

R. Daniel Lindahl argued the cause for appellant. Also on the briefs were John A. Bennett and Bullivant Houser Bailey PC.

Nadia Dahab argued the cause for respondents. Also on the brief were Nadia Dahab LLC; Robert E.L. Bonaparte and Bonaparte & Bonaparte, LLP; Randall Vogt and Vogt & Long PC.

Before Armstrong, Presiding Judge, and Aoyagi, Judge, and Sercombe, Senior Judge.

AOYAGI, J.

Reversed and remanded.

**AOYAGI, J.**

After their property was damaged in a fire that started at a nearby lumber mill, plaintiffs pursued contract claims against their homeowner's insurer, defendant Liberty Mutual Insurance Company, and negligence and other claims against the owner of the lumber mill, Rough & Ready Lumber Company (R&R). Plaintiffs reached a settlement with R&R and released R&R from all claims. After learning of the settlement, defendant asserted an affirmative defense to plaintiffs' contract claims based on plaintiffs' interference with defendant's subrogation rights. Plaintiffs moved for summary judgment on the affirmative defense, arguing that defendant was equitably estopped from asserting its subrogation rights, and the court granted summary judgment on that basis. The case proceeded to trial and resulted in a $10,000 verdict for plaintiffs. Defendant appeals the resulting general judgment, assigning error to the summary judgment ruling on the subrogation defense, as well as a supplemental judgment for attorney fees, costs, and prejudgment interest. For the following reasons, we reverse both judgments and remand.

### FACTS

We state the facts from the summary judgment record in the light most favorable to defendant as the nonmoving party. *See Wirth v. Sierra Cascade, LLC*, 234 Or App 740, 745, 230 P3d 29, *rev den*, 348 Or 669 (2010).

In August 2015, a fire broke out at a lumber mill near plaintiffs' property in Cave Junction. The fire spread onto plaintiffs' property, damaging plaintiffs' home, personal property, and business property.

Plaintiffs had a homeowner's insurance policy issued by defendant, which provided coverage for their home and their personal property but not their business property. That policy included a subrogation provision, which stated:

"**8. Subrogation.** An 'insured' may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

"If an assignment is sought, an 'insured' must sign and deliver all related papers and cooperate with us."

Plaintiffs notified defendant of the fire and started the claims process. An adjuster visited the property to inspect the damage, and, in September 2015, defendant made an initial payment of $2,743, which it considered a partial payment on the claim. A week later, plaintiffs rejected the payment and withdrew their claim. They told defendant that R&R would be accepting responsibility for the damage. Defendant sent a letter to plaintiffs confirming that their claim had been "closed without payment" at their request.

Nearly a year and a half later, in February 2017, plaintiffs filed this action against defendant, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs alleged that they had sought payment from defendant for their covered losses from the fire, but that defendant had "refused to pay all of plaintiffs' losses to real and personal property," thus breaching the insurance contract and causing $55,000 in damages to plaintiffs. On the same day, plaintiffs filed a separate action against R&R, alleging that its negligence caused the fire.

On March 23, 2017, defendant's attorney sent a letter to plaintiffs' attorney. The gist of the letter was that plaintiffs had told defendant in 2015 that they did not want to pursue an insurance claim for the fire damage, that plaintiffs had not given any notice to defendant that they wanted to revive their withdrawn claim, and that plaintiffs should dismiss the suit without prejudice and go through the claims process. Meanwhile, defendant would "consider the lawsuit notice that [plaintiffs] intend to revive their claim" and would reopen the file, assign an adjuster, and adjust the claim.

The letter continued that plaintiffs would need to comply with their duties under the policy. It quoted sections of the policy regarding the insured's duties after a loss, suits against the insurer, and subrogation. Relevant to subrogation, the letter said that defendant would need copies of any payments made by R&R "and any resolution documents,

including possible releases," and pointed to the subrogation condition:

> "It seems evident that there cannot be a breach of the contract of insurance if the insureds have told the insurance company that they do not want to make a claim. Liberty understands that the Nelsons chose to collect their loss from the lumber company responsible for the fire. That entity appears to be named Rough and Ready Mill. *Of course, if the Nelsons have received a recovery from the lumber company, Liberty will need copies of all documents provided to the lumber company or its representative, any payments made by the lumber company, and any resolution documents, including possible releases of the lumber company.*
>
> "*Other provisions in the policy may be at issue. For convenience, we quote* the Suit Against Us condition of Section I (as amended by the SPECIAL PROVISIONS—OREGON endorsement), and *the Subrogation condition.* Other terms and conditions of the policy may be applicable, and Liberty does not waive any term or condition of the policy by quoting only certain terms."

(Emphases added.)

Defendant quoted the subrogation condition in full. It then continued that it was "fine" if plaintiffs wanted to reopen their claim, but that defendant was "entitled to investigate and adjust the claim, including having the insureds comply with the duties set forth in the contract of insurance." Defendant concluded by saying that the loss did not look complicated and that it anticipated a successful adjustment.

By mutual agreement, this action was stayed while defendant adjusted plaintiffs' insurance claim. During the stay, in May 2017, plaintiffs filed an amended complaint, asserting the same claims but greater damages of $125,000. Defendant answered on August 23, 2017, denying that it had breached the insurance contract. The answer also contained a "reservation of defenses" section, in which defendant reserved "all rights, defenses, limitations and conditions under the terms of the insurance policy."

On September 6, 2017, plaintiffs' attorney sent a letter jointly to defendant's and R&R's attorneys, proposing a global mediation. The letter said in full:

"I propose a global mediation in Portland to resolve these cases, using [names of three suggested mediators].

"The *Nelson v. Rough & Ready* case is set for trial on November 7, 2017. The *Nelson v. Liberty Mutual* case will likely be set for trial in spring 2018."

A week later, plaintiffs' attorney told plaintiffs that defendant had "declined the invitation" and that plaintiffs' action against defendant remained stayed and did not have a trial date. Plaintiffs' attorney later attested that he had invited defendant to participate in a global mediation "to resolve all outstanding issues, including defendant's assertion of its right to subrogation."

No mediation occurred in the R&R case. However, plaintiffs reached a settlement with R&R in December 2017 and signed a settlement agreement in January 2018. R&R paid $140,000 to plaintiffs, and plaintiffs released all claims against R&R.

On July 26, 2018, defendant sent a letter to plaintiffs that its claim investigation was complete. After recapping the claim history, defendant said that it had determined that plaintiffs' total covered losses from the fire were $25,870.83, noting that the "majority of the damage involved property not insured by the homeowner's policy." Defendant then told plaintiffs that, during its claim investigation process, it had learned of plaintiffs' settlement with R&R, including plaintiffs' release of all claims against R&R, the party responsible for the fire. After quoting the subrogation condition in full, defendant said that it was asserting its subrogation rights in conjunction with making payment on the claim, that plaintiffs had prejudiced those rights by releasing R&R, and that plaintiffs had breached the subrogation condition:

"As Liberty was still assessing the loss when the insureds settled with [R&R], it could not assert its subrogation rights at that time. But it was apparent to the insureds that coverage would be provided. Liberty now asserts its subrogation

rights. Liberty recognizes that the insureds have released [R&R], thus prejudicing Liberty's subrogation rights and breaching the subrogation provision of the policy."

Rather than void coverage, defendant explained how it intended to address the situation, which, in the end, involved defendant paying plaintiffs $13,676.27—which included covered personal property losses and some attorney fees—and *not* paying $18,200.83 of covered losses for which defendant asserted subrogation rights.

Shortly thereafter, defendant amended its answer to add an affirmative defense based on its subrogation rights. Defendant alleged that plaintiffs were required to assign rights of recovery for a loss to the extent that defendant made payment; that plaintiffs knew that defendant had sought to provide coverage for the loss prior to plaintiffs withdrawing their insurance claim; that plaintiffs knew that defendant was examining the renewed claim and would provide a scope of coverage; that plaintiffs released their rights of recovery against R&R without obtaining a recovery from R&R for the damages claimed under the insurance policy; and that plaintiffs had thereby prejudiced defendant's subrogation rights and breached the policy. Defendant alleged that plaintiffs' conduct voided any coverage or, alternatively, that plaintiffs' recovery from R&R "should be offset against the loss under the policy, less an attorney fee expense that [defendant] would have incurred."

Plaintiffs moved for partial summary judgment on defendant's affirmative defense. They argued that defendant had waived its subrogation rights, or that defendant should be estopped from asserting its subrogation rights, "based on [defendant's] decision not to participate in the possible mediation and failure to secure an assignment of rights prior to the resolution of the [R&R] case." Defendant opposed summary judgment, pointing to its March 2017 letter as creating a genuine issue of material fact.

The trial court concluded that a genuine issue of material fact existed regarding waiver, because defendant "continued to assert its rights to subrogation by letter to Plaintiffs." However, the court granted summary judgment for plaintiffs on their estoppel theory. The court concluded

that defendant was estopped from asserting its subrogation rights because defendant's silence had led plaintiffs to reasonably believe that defendant would not pursue its subrogation rights and because plaintiffs reasonably relied on defendant's inaction. The court reasoned:

> "While defendant did not make an affirmative false representation to Plaintiffs, through their course of conduct and silence they created a reasonable belief that Defendants were not going to assert their right of subrogation because no reasonable person would wait until Plaintiffs settled with the tortfeasor to ask for an assignment of rights. Rather, Defendant sat back and watched it happen. Further, it was reasonable for Plaintiffs to rely on Defendant's inaction, because Defendants were always in a position to assert their right of subrogation before it was too late, and Defendants had knowledge of these facts. Plaintiffs were ignorant of the truth that Defendant now asserts—they want to assert their right of subrogation despite watching the settlement occur precluding subrogation. As the pleadings reveal, Defendant sent a letter to Plaintiffs dated July 26, 2018 saying 'Liberty now asserts its subrogation rights. Liberty recognizes that the insureds have released Rough and Ready, thus prejudicing Liberty's subrogation rights * * *.' It is unconscionable to allow defendant to now complain that Plaintiffs prejudiced Defendant's subrogation rights when they took no action to protect their subrogation right, Plaintiff relied upon that inaction, and Plaintiffs are now materially prejudiced by Defendant's silence and course of conduct."

On that basis, the court granted summary judgment for plaintiffs on defendant's affirmative defense, thus removing the subrogation issue from the case.

After receiving the summary judgment ruling, defendant paid plaintiffs the balance of the covered losses that it had previously withheld. Specifically, defendant paid $12,194.56, which added to the $13,676.27 already paid equaled $25,870.83, *i.e.*, the total covered losses that defendant acknowledged in its letter of July 26, 2018.[1]

---

[1] When defendant made its first payment, it included $6,006.27 for attorney fees, because it was applying the "offset, less attorney fees" methodology described in its affirmative defense. *See* 314 Or App at 355-56. Defendant essentially backed out that payment after the summary judgment ruling, such that

The case proceeded to trial on plaintiffs' breach of contract claim. (Plaintiffs dropped their implied-covenant claim before trial.) A jury awarded plaintiffs $10,000 in damages for additional covered losses not paid. The trial court entered a general judgment in accordance with the verdict. In a supplemental judgment, the court awarded plaintiffs $305,885.25 in attorney fees and $1,307.00 in costs, as well as $11,180.00 of prejudgment interest on claim payments and the damages award.

## SUMMARY JUDGMENT RULING

In its first assignment of error, defendant contends that the trial court erred in granting summary judgment for plaintiffs on defendant's affirmative defense.

Our task is to view the record and all reasonable inferences that may be drawn from it in the light most favorable to defendant to determine whether a genuine issue of material fact exists and, if not, whether plaintiffs are entitled to judgment on the affirmative defense as a matter of law. *See* ORCP 47 C. "No genuine issue of material fact exists if no objectively reasonable juror could return a verdict for the nonmoving party." *Wirth*, 234 Or App at 745. With that standard in mind, we first discuss subrogation generally, then discuss estoppel generally, and finally turn to the trial court's specific ruling in this case.

"Subrogation is a doctrine of equitable origin and nature and its application is controlled by principles of equity rather than by strict legal rules." *MacNab v. Fireman's Fund Ins. Co.*, 243 Or 267, 272, 413 P2d 413 (1966). The doctrine "is based on a theory of restitution and unjust enrichment." *Koch v. Spann*, 193 Or App 608, 612, 92 P3d 146, *rev den*, 337 Or 547 (2004). "It enables a secondarily liable party who has been compelled to pay a debt to be made whole by collecting that debt from the primarily liable party who, in good conscience, should be required to pay." *Id.* "In the insurance context, subrogation permits an insurer in certain instances to recover what it has paid to its insured by,

---

it paid $12,194.56 (instead of $18,200.83) to achieve full payment of the covered losses that it had identified.

in effect, standing in the shoes of the insured and pursuing a claim against the wrongdoer." *Id.*

An insurer's subrogation rights arise only when the insurer makes an "outright payment" to its insured. *Furrer v. Yew Creek Logging Co.*, 206 Or 382, 388, 292 P2d 499 (1956) ("The insurer may have an action against defendant only if it makes an outright payment to plaintiff and becomes thereby subrogated to plaintiff's rights."). Subrogation rights arise as a matter of law once payment is made. *See Metropolitan Property & Casualty v. Harper*, 168 Or App 358, 374, 7 P3d 541 (2000) ("An insurer who makes an outright payment to its insured is subrogated to the insured's claims arising from the loss for which payment was made.").

Generally, an insured's settlement with the tortfeasor—particularly one that releases the tortfeasor from further claims—"results in the insurer's loss of its right to subrogation against the tortfeasor." *Armintrout v. Transportation Ins. Co.*, 137 Or App 86, 90, 903 P2d 407, *rev den*, 322 Or 361 (1995); *see also Federated Service Ins. Co. v. Granados*, 133 Or App 5, 10, 889 P2d 1312, *rev den*, 321 Or 512 (1995) (the insurer "lost a cause of action against the tortfeasor" when the insured settled with the tortfeasor).

Estoppel is also an equitable doctrine. "Estoppel precludes a person, based on the person's acts, conduct, or silence where there was a duty to speak, from asserting a right that otherwise would have been available." *Deardorff v. Farnsworth*, 268 Or App 844, 849, 343 P3d 687, *rev den*, 358 Or 145 (2015). "To constitute an equitable estoppel, or estoppel by conduct, (1) there must be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it." *Guardian Mgmt., LLC v. Zamiello*, 194 Or App 524, 530, 95 P3d 1139 (2004).

Silence may satisfy the false-representation element— that is, a false representation may be made by silence, as well as by speech, much like an omission may take the place of an act—but only if a party is silent when it has "a duty

to speak."[2] *Id.* "[T]he duty to speak does not arise until the party against whom estoppel is urged knows or should know that the failure to speak will likely mislead the other party to act to his or her detriment." *Pfaendler v. Bruce*, 195 Or App 561, 570, 98 P3d 1146 (2004).

Here, viewing the record in the light most favorable to defendant, we disagree with the trial court that no objectively reasonable juror could return a verdict for defendant on its subrogation defense. Specifically, we cannot say that every objectively reasonable juror would find that defendant was silent when it had a duty to speak. Because there is a triable issue of fact on the first element of estoppel, we need not address other elements of estoppel that defendant contends also present triable issues.

In granting summary judgment, the trial court focused on defendant not having requested an assignment of rights until after plaintiffs settled with R&R—describing defendant as having "sat back and watched [the settlement] happen"—and stated that defendant was "always in a position to assert [its] right of subrogation before it was too late." The trial court also described plaintiffs as "ignorant" of defendant's intention to assert its subrogation rights if plaintiffs settled with R&R. Finally, the court stated that it was "unconscionable" for defendant to wait until July 26, 2018, to assert its subrogation rights, when defendant "took no action to protect [its] subrogation right" and plaintiffs relied on that inaction in releasing all claims against R&R.

As a preliminary matter, we note that an assignment of rights is not necessary to pursue subrogation—it is simply a particular vehicle that insurers may use to pursue recovery from a tortfeasor if they wish. *See* 16 *Couch on*

---

[2] The parties' briefing suggests some confusion on this point, so we note that the same elements apply to estoppel by conduct and estoppel by silence—the only difference is how the first element is satisfied, *i.e.*, by proof of an affirmative misrepresentation or by proof of silence when there was a duty to speak. *See Seguin et al. v. Maloney-Chambers*, 198 Or 272, 287, 253 P2d 252, *reh'g den*, 198 Or 288 (1953) (describing the doctrine of equitable estoppel in manner consistent with that approach); *Guardian Mgmt.*, 194 Or App at 530 ("The first element requires a false representation. In this instance, any representation made by defendant was by silence. Silence can be an act for the purpose of equitable estoppel only if a party has a duty to speak.").

*Insurance* § 222:55 (3d ed 2019) ("Because equitable subrogation arises from the fact of the insurer's payment, and the right of subrogation of the insurer exists by virtue of equitable principles, no formal assignment to an insurer is required by an insured of his or her claim against a third person."). It is also important to remember that subrogation rights arise only once the insurer makes payment to the insured, *see Furrer*, 206 Or at 388, which, in this case, occurred in July 2018, *after* plaintiffs had released all claims against R&R.[3] Thus, at the time that plaintiffs settled with R&R, defendant was not yet in a position to assert subrogation rights, and, looking ahead to when it would be, there was no reason that it would be required to obtain an assignment.

Plaintiffs' arguments and the trial court's reasoning also fail to view the record in the light most favorable to defendant as the nonmoving party. Viewed in the light most favorable to defendant, the facts are these. In September 2015, defendant made a partial payment on plaintiffs' insurance claim, and, while defendant was adjusting the claim, plaintiffs withdrew the claim, returned the partial payment, and told defendant that R&R had accepted responsibility and was going to pay for the fire damage. At that point, a reasonable juror could find that defendant had no reason to say anything about subrogation rights, when there was no insurance claim or reason to expect a claim.

Nearly a year and a half later, plaintiffs filed two separate actions—one against R&R and one against defendant. That prompted defendant to send its letter of March 23, 2017, in which defendant told plaintiffs that it would treat their lawsuit as a renewal of their withdrawn insurance claim and start processing the claim. Defendant requested any documentation of any payments made by R&R, as well as "any resolution documents, including possible releases of the lumber company." Defendant then pointed to the subrogation condition and quoted it in full. Although defendant could have said more, what it said was enough to allow an

_____

[3] Plaintiffs acknowledge that defendant had to pay on the insurance claim before it could actually assert its subrogation rights, but they suggest that defendant was dilatory in adjusting the claim and that that somehow should be taken into account. We are unpersuaded that any delay in claim processing changes the subrogation analysis.

objectively reasonable juror to find that defendant put plaintiffs on notice in March 2017 that defendant intended to protect its subrogation rights.

Six months later, in September 2017, defendant declined a global mediation. No mediation occurred. Then, sometime between January and July 2018, during its ongoing claim investigation, defendant learned that plaintiffs had settled with R&R and, more importantly, released all claims against R&R in the process. This appeal comes down to whether defendant's conduct between September 2017 and January 2018 gave rise to estoppel by silence, as a matter of law. We conclude that it did not.

On this record, an objectively reasonable juror could find that, between September 2017 and January 2018, defendant had no duty to speak, as it had reminded plaintiffs of its subrogation rights in March 2017 and was still adjusting plaintiffs' insurance claim. For purposes of estoppel by silence, "the duty to speak does not arise until the party against whom estoppel is urged knows or should know that the failure to speak will likely mislead the other party to act to his or her detriment." *Pfaendler*, 195 Or App at 570. When plaintiffs suggested a global mediation and defendant declined, defendant certainly could have reminded plaintiffs again of its subrogation rights, which likely would have avoided any factual dispute about estoppel. But the question is not whether defendant could have done more—it is whether there is a genuine issue of material fact as to whether defendant remained silent when it had a duty to speak. An objectively reasonable juror could find that defendant did not have a duty to speak between September 2017 and January 2018, because it had already pointed out the subrogation condition to plaintiffs and their attorney, was still adjusting the claim and had not made payment yet, and could reasonably expect plaintiffs to take defendant's subrogation rights into account in any settlement negotiations with R&R.

We therefore agree with defendant that the trial court erred in granting summary judgment on defendant's affirmative defense regarding its subrogation rights and, accordingly, reverse the general judgment.

## SUPPLEMENTAL JUDGMENT

In its second and third assignments of error, defendant seeks reversal of the supplemental judgment awarding attorney fees, costs, and prejudgment interest to plaintiffs. Having reversed the general judgment, the supplemental judgment must be reversed as well. That result is dictated by statute—and, indeed, occurs by operation of law—with respect to the attorney fees and costs. *See* ORS 20.220(3) (providing that, when an appellate court reverses a judgment "to which an award of attorney fees or costs and disbursements relate," "the award of attorney fees or costs and disbursements shall be deemed reversed"); *ZRZ Realty v. Beneficial Fire & Casualty Ins.*, 257 Or App 180, 186-87, 306 P3d 661, *rev den*, 354 Or 491 (2013) (applying ORS 20.220(3) to conclude that, when we reversed the underlying general judgment, a supplemental judgment for attorney fees "was deemed reversed by operation of law"). As for the prejudgment interest, that award also depends on the general judgment and therefore must be reversed.

Accordingly, both the general judgment and the supplemental judgment are reversed, and the case is remanded for further proceedings.[4]

Reversed and remanded.

---

[4] Defendant requests that we specifically instruct the trial court to hold a new trial on all issues. Although a new trial on all issues may well be necessary, our usual practice is to allow the trial court to decide in the first instance how to proceed on remand, and we are disinclined to vary that practice here to address a speculative concern.