Argued and submitted July 2, 2014, reversed and remanded July 22, 2015

YOSHIDA'S INC.,
an Oregon corporation,
*Plaintiff-Appellant,*

*v.*

DUNN CARNEY ALLEN HIGGINS & TONGUE LLP,
an Oregon limited liability partnership;
and Brian Cable, an individual,
*Defendants-Respondents.*

Multnomah County Circuit Court
110505726; A152507

356 P3d 121

Corey Tolliver argued the cause for appellant. With him on the briefs were Shannon Flowers, Bonnie Richardson, and Folawn Alterman & Richardson LLP.

Thomas W. McPherson argued the cause for respondents. With him on the brief were Mersereau Shannon LLP.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Wollheim, Senior Judge.

LAGESEN, J.

## LAGESEN, J.

This is an action for negligence (legal malpractice) and breach of contract against a law firm, defendant Dunn, Carney, Allen, Higgins & Tongue, LLP, and one of the law firm's partners, Cable (collectively, defendants). The trial court directed a verdict for defendants on plaintiff's breach of contract claim, and the jury returned a defense verdict on the professional negligence claim. The issues on appeal are whether the trial court erroneously admitted evidence of confidential mediation communications, in violation of ORS 36.222,[1] and whether it erred in directing a verdict for defendants on the breach of contract claim. We conclude that the trial court erred in both respects and, accordingly, reverse and remand for further proceedings consistent with this opinion.

## I.  FACTS

After it was purchased by another entity, defendants' former client, OIA Global Logistics-SCM, Inc. (OIA), assigned to plaintiff, Yoshida's, Inc., its legal malpractice claim against defendants. The claim arose from defendants' alleged mishandling of the termination of an equipment and software lease between OIA and Winthrop Resources Corporation (Winthrop), a corporation located in Minnesota.

OIA produces packaging for a footwear company. In 2006, as part of a sale-leaseback arrangement, OIA sold warehouse equipment and software to Winthrop, and then leased back the equipment and software. The original lease term was three years, ending no later than November 30, 2009; there was some uncertainty as to when the lease term began and when the lease term ended. The lease provided that it would automatically renew for an additional fourth

---

[1] ORS 36.222 provides, in pertinent part:

"(1) Except as provided in ORS 36.220 to 36.238, mediation communications and mediation agreements that are confidential under ORS 36.220 to 36.238 are not admissible as evidence in any subsequent adjudicatory proceeding, and may not be disclosed by the parties or the mediator in any subsequent adjudicatory proceeding.

"(2) A party may disclose confidential mediation communications or agreements in any subsequent adjudicative proceeding if all parties to the mediation agree in writing to the disclosure."

year unless OIA notified Winthrop no later than 120 days before the lease's termination date that OIA intended to terminate the lease. The lease also provided that it would automatically renew for an additional year if, having terminated the lease, OIA did not return the leased equipment and software to Winthrop within 10 days of the termination date.

In July 2009, OIA determined that it wanted to terminate the lease at the expiration of the three-year term, although OIA recognized that it was not certain of the lease's end date. On July 29, 2009, OIA, through its chief financial officer (CFO), Sether, contacted Miller—an associate at defendant law firm who assisted defendant Cable in the firm's work for OIA—by phone and then by follow-up e-mail. Sether requested defendant law firm's assistance in terminating the lease before its end date, which Sether described as being "anytime between Today and 11/1/2009." In the e-mail following up on the phone conversation, Sether informed Miller that "the big things are getting out of the lease ASAP," and that "[a]t the very least it appears the termination notice is in order ASAP." Sether identified "[r]each[ing] a near $1 dollar or less buyout" of the software and equipment as another priority, noting that OIA would not be able to return some portion of the equipment and wanted to continue using the software. The next day, Miller responded:

> "Thank you for the information. I will review and follow up with you shortly. I did discuss the matter briefly with Brian Cable as he was involved in the issue during the NGL due diligence period. He has sent me his correspondence with Winthrop and provided me with some additional background."

In response to Miller's e-mail, Sether reiterated that, "as stated[,] probably the intent to terminate notice is the first step and then we work on the other facets *** and the residual."

Approximately one month later, on August 26, 2009, Miller provided OIA with a notice-of-termination letter for OIA to send to Winthrop. OIA immediately forwarded the letter to Winthrop. Upon receiving the letter, Winthrop notified OIA that the notice of termination was not timely

under the terms of the lease and that, in its view, the lease extended for an additional year as a result. After discussing Winthrop's response to OIA's attempt to terminate the lease, defendant law firm concluded that it could no longer represent OIA in connection with the lease dispute because OIA might have "potential claims" against it.

OIA thereafter retained counsel in Minnesota to assist it with the resolution of the lease dispute. Ultimately, on February 10, 2010, OIA and Winthrop mediated their dispute and resolved it through mediation. They executed a "Mediated Settlement Agreement" on February 10, 2010. Two days later, OIA's CFO, Sether, notified OIA's Minnesota lawyers that there were "two minor changes that [OIA] would like to see modified in the Winthrop final documents." Sether requested, among other changes, that the bill of sale indicate that the "residual value" of the equipment was $25,000. The parties then executed a final "Settlement Agreement and Release." Under its terms, Winthrop agreed to transfer title of the equipment and software to OIA, and OIA agreed to pay $325,000 to Winthrop. The agreement required Winthrop to execute a bill of sale to OIA in connection with the transfer of the equipment, upon delivery of the settlement payment. It further specified that the "[p]rice for transferring Winthrop's title to the equipment" to OIA was $25,000 and that the remaining $300,000 was in "[s]ettlement of remaining monthly lease charges due under the Lease." Thereafter, OIA assigned its claims against defendants to plaintiff, and plaintiff filed this action.[2]

The case was tried to a jury. Before trial, plaintiff moved *in limine* under ORS 36.222 to exclude "all mediation communications" made in the course of or in connection with the mediation between OIA and Winthrop. In support of the motion, plaintiff provided the court with a packet of the e-mail communications that, in its view, had to be excluded under ORS 36.222. Plaintiff argued that the statute barred

---

[2] The original complaint alleged only a claim for legal malpractice. Plaintiff amended the complaint to add the claim for breach of contract. Defendants objected to the amendment on the ground that OIA's assignment of claims to plaintiff did not encompass the breach of contract claim, but the trial court rejected that argument. On appeal, defendants do not argue that the breach of contract claim was not within the scope of OIA's assignment to plaintiff.

the introduction into evidence of those communications, because the parties to the mediation had not consented in writing to their disclosure, and because no other statutory exception authorizing the evidentiary use of such communications applied. Defendants opposed the motion, asserting that Minnesota, not Oregon, law governed the admissibility of mediation communications related to the mediation between OIA and Winthrop, and that ORS 36.222 thus did not preclude the admission of communications related to the OIA and Winthrop mediation. Defendants argued further that the communications were admissible to undercut plaintiff's claim that OIA was damaged by defendants' alleged negligence, and to show that OIA's settlement with Winthrop was not a reasonable one and that OIA could have mitigated its damages. Defendants also argued that plaintiff effectively waived the protections of ORS 36.222 by filing the malpractice action, thereby putting at issue how much plaintiff was damaged by defendants' alleged malpractice. In response, plaintiff contended that Minnesota and Oregon law *both* required the exclusion of the mediation communications.

The trial court denied the motion. The court did not "debat[e]" that the communications were, in fact, mediation communications under ORS 36.110(7). It nonetheless concluded that "mediation confidentiality" did not apply and "that the issue of what happened at the mediation comes into play, so I think it is admissible, and so the communications that happened around that are going to be admissible." The court reasoned that the mediation communications that defendant sought to introduce were from a mediation in a different case—the dispute between OIA and Winthrop—and that the statute therefore did not preclude the introduction of the communications in the malpractice case, because the communications were relevant to the issue of whether plaintiff had been harmed by defendants' alleged malpractice.

Based on the court's ruling, three e-mails connected to the resolution of the lease dispute between OIA and Winthrop were introduced into evidence at trial, and Sether was examined about them. The first e-mail, dated January 5, 2010, was from Sether to OIA's Minnesota attorneys for the lease dispute. In it, as "a starting point for conversation related to the equipment values," Sether estimates that

the market value of the equipment was "$250-$275K." The second e-mail, dated February 5, 2010, was from Sether to OIA's president. In it, Sether states that he had requested an OIA employee, Wogan, to evaluate the assets under the lease with Winthrop. Sether notes that Wogan came up with a value "in the $ 200K range," which provides some "good context" for negotiation in the upcoming mediation. The attached analysis by Wogan identifies three different methods for valuing the equipment; depending on the valuation method employed, Wogan's analysis attributes a value to the property ranging from $0-$239,000. The third e-mail, dated two days after the mediation between OIA and Winthrop, is from Sether to OIA's attorney in the lease dispute. In the e-mail, Sether requests that OIA's attorney arrange for changes in the final settlement paperwork:

> "They would like the bill of sale to show—'residual value—equipment $25,000' obviously the settlement agreement is fine as we paid a total of $325,000[,] but for the equipment that's not the sales amount, that includes residual value termination contract value."

(Emphasis omitted.)

At the close of plaintiff's case, defendants moved for a directed verdict on both claims. With respect to the breach of contract claim, defendants argued that, in the case of an attorney-client relationship, a client cannot sue an attorney for breach of contract and negligence unless the contract is "an express specific promise to achieve a certain result." Defendants then asserted that there was no evidence that would permit a finding that OIA had an express contract with defendants, requiring the grant of a directed verdict. The trial court agreed and granted the motion as to the breach of contract claim, explaining that "it does take an express agreement," and that "I don't think an express agreement, even in the light applied to a directed verdict standard, has been met here. And I am granting directed verdict on the contract claim."

The trial court subsequently submitted the negligence claim to the jury. In closing argument, defendants urged the jury to find that defendants were not negligent. Alternatively, defendants argued that any negligence by

defendants did not damage plaintiff. Defendants pointed out that plaintiff had sold some of the equipment covered by the lease and urged the jury to conclude that the lease would have automatically renewed anyway, even if defendants had not been negligent, because plaintiff would not have been able to return the equipment to Winthrop within 10 days of the date the lease terminated, as required by the lease. Defendants also argued that plaintiff was not harmed by any negligence of defendants because the settlement was, in effect, the purchase of the equipment at a reasonable price—something that plaintiff had wanted to accomplish all along. In making that argument, defendants relied heavily on plaintiff's mediation communications estimating the value of the equipment to OIA. The jury returned a verdict for defendants. The jury found that defendants were negligent, but that defendants' negligence did not cause damages to plaintiff. The trial court entered a general judgment in favor of defendants, and plaintiff timely appealed.

On appeal, plaintiff assigns error to the trial court's denial of plaintiff's pretrial motion *in limine* to exclude evidence of confidential mediation communications under ORS 36.222. Plaintiff also assigns error to the trial court's grant of defendants' motion for a directed verdict on the breach of contract claim.

## II. STANDARDS OF REVIEW

The trial court denied plaintiff's motion *in limine* regarding mediation communications, based on its interpretation of the scope of ORS 36.222. Where the trial court admits or excludes evidence based on the court's interpretation of a statute, we review the court's ruling for legal error. *See State v. Edwards*, 231 Or App 531, 533, 219 P3d 602 (2009) (so doing). On review of the trial court's grant of defendants' motion for a directed verdict, we view the evidence, and all reasonable inferences therefrom, in the light most favorable to the nonmoving party (in this case, plaintiff), and review to determine whether any reasonable factfinder could find in favor of the nonmoving party. *Trees v. Ordonez*, 354 Or 197, 205-06, 311 P3d 848 (2013). A directed verdict is appropriate only if the moving party is entitled to judgment as a matter of law. *Id.*

## III. ANALYSIS

### A. *Mediation communications*

We first address plaintiff's contention that the trial court erred by denying its motion to exclude communications related to the mediation of the lease dispute between OIA and Winthrop. In particular, plaintiff contends that the trial court erred by admitting three documents that plaintiff asserts are not admissible under ORS 36.222: (1) the January 5, 2010, e-mail from Sether to OIA's president and Minnesota counsel regarding the valuation of the equipment at issue in the lease; (2) the February 5, 2010, e-mail from Sether to OIA's president further discussing the equipment values and "wondering if [they] should share [the valuation information] with [Minnesota counsel] before next week's mediation"; and (3) the February 12, 2012, e-mail from Sether to Minnesota counsel asking for adjustments to the final settlement documents, including the equipment bill of sale to reflect a "residual value" of $25,000.[3] As noted, the trial court denied plaintiff's motion based on its conclusion that ORS 36.222 did not require the exclusion of those communications and material because the mediation took place in a different case, not in the instant malpractice case.

That conclusion is erroneous. ORS 36.222 generally makes any communication that qualifies as a confidential "mediation communication" under ORS 36.110(7)[4] inadmissible in any "adjudicatory proceeding" occurring after the communication. ORS 36.222 states, in pertinent part:

---

[3] In its opening brief, plaintiff suggests that the Mediated Settlement Agreement executed by OIA and Winthrop on February 10, 2010, also is a protected mediation communication. However, in its reply brief, plaintiff focuses on the e-mail communications. For that reason, we treat the e-mail communications as the communications at issue for purposes of our analysis.

[4] ORS 36.110(7) provides, in part:

"'Mediation communications' means:

"(a) All communications that are made, in the course of or in connection with a mediation, to a mediator, a mediation program or a party to, or any other person present at, the mediation proceedings; and

"(b) All memoranda, work products, documents and other materials, including any draft mediation agreement, that are prepared for or submitted in the course of or in connection with a mediation or by a mediator, a mediation program or a party to, or any other person present at, mediation proceedings."

"(1)    Except as provided in ORS 36.220 to 36.238, mediation communications and mediation agreements that are confidential under ORS 36.220 to 36.238 are not admissible as evidence in any subsequent adjudicatory proceeding, and may not be disclosed by the parties or the mediator in any subsequent adjudicatory proceeding.

"(2)    A party may disclose confidential mediation communications or agreements in any subsequent adjudicative proceeding if all parties to the mediation agree in writing to the disclosure."

The statute means what it says. Contrary to the trial court's conclusion, mediation communications generally are not admissible evidence in *any* later adjudicatory proceeding, even if that proceeding is not the same proceeding in which the mediation occurred. For example, in *Alfieri v. Solomon*, 263 Or App 492, 494-503, 329 P3d 26, *rev allowed*, 356 Or 516 (2014), we concluded that ORS 36.222(1) barred the plaintiff in a legal malpractice case from using confidential mediation communications to prove the plaintiff's claim that the defendant lawyer had negligently mediated an employment dispute on the plaintiff's behalf. 263 Or App at 494-95, 501-02. We explained that, "[g]enerally, confidential mediation communications and confidential mediation agreements 'are not admissible as evidence in any *subsequent adjudicatory proceeding*, and may not be disclosed by the parties or the mediator in any *subsequent adjudicatory proceeding*.'" *Id.* at 497-98 (quoting ORS 36.222(1)) (emphases added). Although ORS 36.222 contains a number of exceptions to the limitations on the disclosure and admissibility of mediation communications, those exceptions, on their face, do not appear to apply here, and defendants do not suggest otherwise. *See* ORS 36.222(2) - (6) (establishing exceptions to the mediation-communication privilege).

Defendants assert that the trial court's decision to admit the evidence, even if based on an erroneous understanding of ORS 36.222, can be sustained on other grounds. First, defendants argue, as they did below, that Minnesota, not Oregon, law controls the issue of whether the communications related to the OIA-Winthrop mediation of the lease dispute are admissible in a subsequent adjudicatory proceeding and that, under Minnesota law, the communications

were admissible. Second, defendants argue, for the first time on appeal, that, if Oregon law governs, the communications at issue do not meet the definition of "mediation communications" under ORS 36.110(7) and, for that reason, were properly admitted into evidence by the trial court. Third, defendants contend that plaintiff waived the privilege afforded to mediation communications, both by filing this action and by disclosing the communications in discovery, making those communications admissible. For the reasons that follow, none of those arguments provides a basis for this court to sustain the trial court's decision to admit the communications at issue.

First, to the extent that defendants assert that plaintiff waived the statutory privilege afforded to mediation communications by filing this case or by disclosing the communications in discovery, the terms of ORS 36.222 foreclose that conclusion. The statute states plainly that, "[e]xcept as provided in ORS 36.220 to 36.238, mediation communications and mediation agreements that are confidential under ORS 36.220 to 36.238 *are not admissible as evidence in any subsequent adjudicatory proceeding, and may not be disclosed by the parties or the mediator in any subsequent adjudicatory proceeding.*" ORS 36.222(1) (emphasis added). Again, we understand that provision to mean what it says: Unless one of the statutory exceptions applies, mediation communications are not admissible into evidence. We are not, through the act of judicial interpretation, permitted to expand that limited list of statutory exceptions crafted by the legislature to include new exceptions, such as unilateral waiver through a party's conduct. *Crimson Trace Corp. v. Davis Wright Tremaine LLP*, 355 Or 476, 496-97, 232 P3d 980 (2014) (when the statute establishing evidentiary privilege also expressly contains a list of specific exceptions, "the legislature fairly may be understood to have intended to imply that no others are to be recognized"). That is so especially in light of the legislature's explicit decision to require that "*all* parties to the mediation agree in writing to the disclosure" of mediation communications in a subsequent adjudicatory proceeding, and its omission of any statutory mechanism allowing for one party to unilaterally waive that confidentiality. ORS

36.222(2) (emphasis added). As noted, defendants do not contend that the mediation communications at issue in this case are admissible under any of the express exceptions to the mediation-communication privilege crafted by the legislature, and, in any event, none of the exceptions appears to apply to the communications at issue here.

Second, to the extent that defendants assert that the communications at issue are not, in fact, "mediation communications" as defined by ORS 36.110(7), that argument does not present grounds for affirmance because defendants did not raise that argument below and, had they done so, the record may have developed differently.[5] *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (for appellate court to affirm trial court's ruling on an alternative basis requires, among other things, "that the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below"). Specifically, if defendants had contested below whether the e-mails at issue were, in fact, mediation communications, plaintiff would have been entitled to introduce additional foundational evidence under OEC 104(1) to establish that the communications did, in fact, occur "in connection with a mediation" among parties covered by the privilege so as to render the mediation privilege applicable. *See* ORS 36.110(7); ORS 36.222(1). Because defendants opted not to dispute that the communications at issue were mediation communications, plaintiff did not have that opportunity. Accordingly, for purposes of our review, we

---

[5] At the hearing on plaintiff's motion *in limine* to exclude mediation communications, plaintiff presented to the court (and to defendants' lawyers) a packet of e-mails that plaintiff contended were covered by the mediation-communication privilege. Although we have not been able to locate that packet in the trial court file, the discussions of the contents of that packet indicate that it contained the communications on which plaintiff predicates its arguments on appeal. Specifically, in describing the communications put at issue by the motion *in limine*, the parties discussed both the communications regarding valuation leading up to mediation, noting that "there is a transactional history that leads up to that mediation where the parties are communicating their thought process for assigning values to their respective positions that then formed the settlement that is now an item of damage in our case," and the post-mediation communications leading to formalization of the mediation settlement, including the e-mail requesting that the final settlement documents reflect that the equipment's residual value was $25,000.

(as did the trial court) treat the communications at issue as mediation communications under ORS 36.222(7).[6]

Third, and finally, defendants' choice-of-law arguments do not provide a basis for affirming the trial court's ruling. We assume without deciding that the Oregon courts would be obligated to apply Minnesota law regarding the privilege afforded to mediation communications if either party established that Minnesota law should govern this dispute.[7] Nevertheless, we decline to resolve the parties' dispute over the scope of the privilege for mediation communications under Minnesota law, because defendants have not made the threshold showing required to invoke another state's laws in the courts of this state. As the proponents of the application of Minnesota law, it is "incumbent on" defendants to demonstrate "whether there is a material difference between Oregon substantive law and the law of the other forum. If there is no material difference—if there is a 'false conflict'—Oregon law applies." *Angelini v. Delaney*, 156 Or App 293, 300, 966 P2d 223 (1998) (citations omitted). A false conflict exists when "no substantial conflict is found to exist between the states' policies or interests" or "where the laws of two states are the same or would produce the

---

[6] In the absence of any contention by defendants that the communications were not, in fact, mediation communications, it was not unreasonable for the trial court to find that the communications were mediation communications. The communications occurred relatively close in time to the mediation and discuss what appears to be OIA's mediation strategy. Although some of the e-mails, on their face, do not compel a finding that they are, in fact, mediation communications, nothing on their face would preclude such a finding, either. And, at least one of the e-mails—the one dated February 5, 2010—states that its purpose is to provide "some good context for negotiation" in advance of the mediation the following week, which suggests that communication was made "in connection" with the pending mediation.

[7] Plaintiff argues that the scope of the privilege afforded to mediation communications is a procedural issue, such that the laws of the forum state always apply. As noted, we do not address that issue in the light of our conclusion that defendants have not demonstrated a material difference between Oregon and Minnesota law regarding the scope of the evidentiary privilege afforded to mediation communications. It is not readily apparent to us that the scope of the privilege afforded to mediation communications is properly characterized as procedural for choice-of-law purposes. As Oregon's own statutes reflect, in creating a privilege for mediation communications, the legislature made a substantive policy choice regarding such communications in order to encourage parties "to resolve their dispute with the assistance of a trusted and competent third party mediator, whenever possible, rather than the dispute remaining unresolved or resulting in litigation." ORS 36.100.

same results." *Erwin v. Thomas*, 264 Or 454, 457-58, 506 P2d 494 (1973).

Here, defendants have not demonstrated a material difference between the laws of Oregon and the laws of Minnesota. The only difference that defendants have identified is a difference in wording between the applicable Minnesota statutes and the applicable Oregon statutes. But defendants have not shown that that difference in wording amounts to a material difference between Minnesota law and Oregon law. To the contrary, the applicable Minnesota statute and rule of practice appear on their face to render mediation communications inadmissible to the same extent that Oregon law does. Minn Stat § 595.02(1)(m) states:

> "A person cannot be examined as to any communication or document, including work notes, made or used in the course of or because of mediation pursuant to an agreement to mediate or a collaborative law process pursuant to an agreement to participate in collaborative law. This does not apply to the parties in the dispute in an application to a court by a party to have a mediated settlement agreement or a stipulated agreement resulting from the collaborative law process set aside or reformed. A communication or document otherwise not privileged does not become privileged because of this paragraph. This paragraph is not intended to limit the privilege accorded to communication during mediation or collaborative law by the common law."

By precluding the examination of any person regarding mediation communications or documents, the statute effectively precludes the use of such communications as evidence. If no witness can be examined about such communications, it is difficult to see how such communications or documents could be introduced into evidence; without examination, there would be no way for a litigant to lay a foundation for the admission of that evidence.

The terms of Minnesota General Rule of Practice 114.08 further indicate that mediation communications are privileged under Minnesota law in much the same way that they are under Oregon law, specifying that statements made and documents produced in an alternative dispute resolution proceeding generally are not admissible in subsequent

proceedings involving any of the issues or parties to the alternative dispute resolution proceeding. It states, in relevant part:

"(a)   Evidence. Without the consent of all parties and an order of the court, or except as provided in Rule 114.09(e)(4), no evidence that there has been an ADR proceeding or any fact concerning the proceeding may be admitted in a trial de novo or in any subsequent proceeding involving any of the issues or parties to the proceeding.

"(b)   Inadmissibility. Subject to Minn. Stat. § 595.02 and except as provided in paragraphs (a) and (d), no statements made nor documents produced in non-binding ADR processes which are not otherwise discoverable shall be subject to discovery or other disclosure. Such evidence is inadmissible for any purpose at the trial, including impeachment."

Minn Gen R Prac 114.08.

Thus, on its face, Minnesota law appears to afford the same evidentiary privilege to mediation communication that Oregon law affords them. Defendants have not identified any decisions from the Minnesota courts suggesting that the Minnesota mediation privilege is narrower in scope than the words of Minn Stat § 595.02 indicate, and "it is not our obligation to cast around the law of [Minnesota] in quest of possible material differences." *Angelini*, 156 Or App at 300. Accordingly, defendants' arguments regarding Minnesota law, and the scope of the privilege afforded to mediation communications under it, do not provide an alternative basis for sustaining the trial court's judgment.

Having concluded that the trial court erred in denying plaintiff's motion to exclude the mediation communications at issue, we assess whether the error requires reversal. We conclude that it does. An evidentiary error is reversible only if it substantially affects a party's rights. OEC 103(1); ORS 19.415(2). Evidentiary errors substantially affect a party's rights and, therefore, require reversal "when the error has some likelihood of affecting the jury's verdict." *Dew v. Bay Area Health District*, 248 Or App 244, 258, 278 P3d 20 (2012) (citations omitted); *see also Purdy v. Deere and Company*, 355 Or 204, 226, 324 P3d 455 (2014) (same).

Here, our review of the record persuades us that there is "some likelihood" that the erroneously admitted evidence affected the jury's determination that defendants' conduct (which the jury found to be negligent) did not cause OIA to suffer any damages. One of defendants' central attacks on plaintiff's case for causation relied heavily on the erroneously admitted mediation communications. Defendants asserted that their negligence—if any—did not cause damages to OIA because, regardless of defendants' negligence, OIA had intended to purchase the equipment and would have had to negotiate with Winthrop to do so. Defendants argued further that the settlement amount simply represented a reasonable purchase price for the equipment and that the $25,000 value assigned to the equipment by the settling parties did not accurately represent the equipment's value. In closing argument, defendants pointed to the erroneously admitted communications as proof that the equipment value was not $25,000 but, instead, was much closer to the $325,000 settlement amount. From that evidence, defendants were able to argue that plaintiff was not damaged by any negligence by defendants because the deal reached by plaintiff was, in effect, a negotiated equipment purchase that plaintiff would have made for a similar price even absent a breach:

"Now, let's assume further that the [lease] negotiations were to take place [before any breach]. What was [plaintiff] willing to pay for that equipment? We have some evidence on that, and we know how [plaintiff] was valuing that equipment.

"* * * * *

"Let's look at Exhibit 127. Here we are in January 2010, and now the matter's in the hands of the Minnesota lawyers. Now [plaintiff's CFO] is saying to [plaintiff's President], 'I would recommend at or around [$]250[] to 275,000.' Reflecting the value of that equipment. And, obviously, that's what they were willing to pay then.

"[Exhibit] 135. This is the best one of all three of these in terms of the actual thinking going on [with plaintiff] about this equipment. This is later in 2010. This time [plaintiff's CFO] has asked one of the internal guys [who works for plaintiff], a fellow named * * * Wogan, 'Put together an analysis of the value of that equipment.'

"Let's look at the second page. This is Mr. Wogan's analysis, January 29, 2010. Look at number 2. [Plaintiff's] value, close to $200,000. 'We are still using the assets. And this number reflects what I believe is a fair value to [plaintiff].'

"Ladies and gentleman, as we sit here today [plaintiff] has some of those assets. They are still using that software. They weren't about to give it up. They could not give it up.

"\* \* \* \* \*

"As far as the $25,000 equipment residual value at settlement, it is absolutely preposterous to think that that is, to [plaintiff], the true value of that equipment. Remember the evidence?

"\* \* \* \* \*

"But to suggest that the $25,000 is the actual value to [plaintiff] of that equipment, that doesn't work. Not with the kind of evidence we just showed with regard to that."

Apart from the erroneously admitted communications, the record contains little other evidence that counters plaintiff's $25,000 valuation of the equipment or suggests that the settlement payment represented a purchase of the equipment for a reasonable price.[8] The only other properly admitted evidence that the equipment value approached the $325,000 settlement amount was an e-mail from Sether to defendants, sent in October 2009 while defendants still represented OIA. In that e-mail, Sether describes the "market value" of the equipment as "around $285-$325K." However, Sether minimized the accuracy of that early computation in his trial testimony, testifying that it was based on "a schedule" provided by Winthrop and that his own view was that the equipment did not have any value. The erroneously admitted e-mails—particularly the February 5, 2010, e-mail containing an OIA employee's valuation of the equipment under different methodologies—allowed defendants to undercut Sether's testimony downplaying the October 2009 valuation. In particular, defendants employed the February 5 e-mail to demonstrate, contrary to Sether's testimony, that

---

[8] Neither party introduced any expert valuation of the equipment, relying instead on evidence of OIA's various valuations of the equipment—both internal and external—during the course of the negotiations and mediation with Winthrop.

OIA ascribed substantial market value to the assets even when OIA performed its own independent valuation of the equipment. As noted, defendants emphasized that point in closing argument, arguing that the February 5, 2010, e-mail "is the best one of all three of these in terms of the actual thinking going on in OIA about this equipment."

For those reasons, we conclude that there is "some likelihood" that the erroneously admitted e-mails affected the jury's verdict. Although we acknowledge that defendants attacked plaintiff's case on causation in one other way,[9] given defendants' emphasis on OIA's valuation of the equipment as negating any inference that OIA was damaged by defendants' failure to terminate the lease, there is some likelihood that the jury relied on the erroneously admitted communications—particularly the February 5, 2010, e-mail—to find that the amount paid in settlement by OIA was simply a reasonable purchase price for the equipment, and that defendants' negligence did not, therefore, cause damage to OIA, which had planned to purchase the equipment all along. We therefore reverse and remand for a new trial.

## B. *Directed verdict on breach of contract claim*

We next consider the trial court's grant of defendants' motion for a directed verdict on the breach of contract claim. In that claim, plaintiff alleged that OIA and defendants entered into a contract under which defendants "specifically agreed to prepare and provide notice of termination of the lease in a timely manner" and that defendants breached that contract "by failing to prepare and provide notice of termination of the lease in a timely manner."

---

[9] As noted, defendants also argued that their failure to give timely notice of termination did not damage OIA because OIA had sold some of the equipment covered by the lease, making it likely that the lease would renew even if OIA had given timely notice of termination, in light of the lease provision specifying that OIA's failure to return the equipment within 10 days of the date that the lease ended would trigger an automatic renewal. However, plaintiff countered that line of defense by pointing to expert testimony opining that, had the lease been timely terminated, the lease would not have renewed and OIA "wouldn't have had to pay to the additional liability for the year and you would have negotiated some amounts for the equipment." Those arguments and evidence increase the likelihood that the jury's assessment of the value of the equipment played a central role in its causation determination, because they increase the likelihood that the jury assessed causation by trying to determine what OIA would have paid for the equipment if the lease had been terminated in a timely manner.

Defendants defend the trial court's ruling, arguing that, "to make out a claim for breach of contract in the attorney-client context, the plaintiff must plead and prove that a promise to accomplish a defined objective was made by the attorney. If the plaintiff fails to offer evidence that such a promise was made, the breach of contract claim must be dismissed." Defendants argue further that the record demonstrates a "failure of proof" that defendants promised to prepare the notice of lease termination "by any particular date," and that, as a result, the trial court correctly directed a verdict on the breach of contract claim.

We disagree. In general, Oregon law does not require that a client suing a lawyer for breach of contract to provide professional legal services prove that the contract between the lawyer and the client took a particular form. Rather, Oregon law long has provided that a client may sue an attorney under both contract and negligence theories. In *Currey v. Butcher*, 37 Or 380, 384-85, 61 P 631 (1900), the Supreme Court observed that the attorney-client relationship arises out of the existence of a contract, "either express or implied." From that contract, "the law imposes a duty to exercise reasonable care and skill." *Id.* If the attorney fails to perform that duty in a manner that results in injury to the client, the court noted that the client "could sue, *either* in [contract], for a breach of the implied promise, *or* in [tort], for the neglect of duty." *Id.* at 385 (trial court had appropriately overruled the attorney defendants' motion for an order requiring the client plaintiff to choose a remedy under either tort or contract) (emphases added). In the absence of any statute-of-limitation issues[10]—and none is raised here—no special rules govern the pleading and proof of a client's claim against a

---

[10] By contrast, a client seeking to pursue a breach of contract claim against an attorney outside of the two-year-limitation period applicable to negligence claims, but within the six-year statute of limitation applicable to contract claims, must plead and prove that the attorney contracted with the client "to perform specific contractual duties irrespective of the general standard of care." *Allen v. Lawrence*, 137 Or App 181, 184, 903 P2d 919 (1995). Otherwise, "[i]f the alleged contract merely incorporates by reference or by implication a general standard of skill and care to which the defendant would be bound independent of the contract, and the alleged breach would also be a breach of this noncontractual duty," then the tort statute of limitation applies. *Id.* (quoting *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 259, 611 P2d 1158 (1980) (quoting *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992))).

lawyer for breach of contract; a client may seek to enforce an attorney's express or implied promise to perform in accordance with the general standard of care under either a negligence theory, a contract theory, or both. *Metropolitan Property & Casualty v. Harper*, 168 Or App 358, 368-69, 7 P3d 541 (2000) (explaining how statutes of limitation bear on issue of whether client can sue attorney under breach of contract theory).[11]

In urging us to reach a different conclusion, defendants rely on two lines of cases. Neither line of cases assists defendants. *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 611 P2d 1158 (1980), exemplifies the first line of cases. It stands for the proposition that a claim for breach of a contract to provide professional services is barred by the two-year statute of limitation applicable to negligence claims unless the plaintiff pleads and proves that the defendant agreed "to perform specific contractual duties irrespective of the general standard of care" and then breached that agreement. *Allen v. Lawrence*, 137 Or App 181, 184, 903 P2d 919 (1995) (explaining rule of law established by *Securities-Intermountain*); *Metropolitan Property & Casualty*, 168 Or App at 368-69 (same). This case does not present any statute-of-limitation issues. Accordingly, the standards of pleading and proof for a claim for breach of a professional services contract filed outside the two-year negligence limitation period are not applicable here. In other words, those cases provide no basis for concluding that plaintiff's proof of the existence of a contract was insufficient to withstand defendants' motion for a directed verdict.

*Hale v. Groce*, 304 Or 281, 744 P2d 1289 (1987), and *Caba v. Barker*, 341 Or 534, 145 P3d 174 (2006), exemplify

---

[11] Oregon's approach is consistent with the *Restatement* approach. It provides that "[a] lawyer is subject to liability to a client for injury caused by breach of contract in the circumstances and to the extent provided by contract law." *Restatement (Third) of Law Governing Lawyers* § 55(1) (2000). Comment c to section 55 further provides that

"[a] client's claims for legal malpractice * * * can be considered either as tort claims for negligence or breach of fiduciary duty or as contract claims for breach of implied terms in a client-lawyer agreement. Ordinarily, a plaintiff may cast a legal-malpractice claim as a tort claim, a contract claim, or both and often also as a claim for breach of fiduciary duty. * * * The choice of theory may, however, affect what statute of limitations applies[.]"

the second line of cases invoked by defendants. But those cases also do not stand for the proposition that plaintiff was required to plead and prove that it had an "express" contract with defendants. Instead, as we have explained, those cases "stand for the proposition that an essential element of a breach of contract or negligence claim *by a nonclient plaintiff* against an attorney *who prepared a testamentary instrument* is the existence of a promise by the attorney— either express or implied—to include specific provisions to satisfy certain objectives of the client for the benefit of the plaintiff." *Deberry v. Summers*, 255 Or App 152, 161, 296 P3d 610 (2013) (citing *Frakes v. Nay*, 254 Or App 236, 267, 295 P3d 94 (2012)) (emphases added). Those cases have no applicability under the circumstances present here.

Accordingly, the trial court erred when it concluded that plaintiff was required to demonstrate that defendants made an "express" contract with OIA to deliver the notice by the particular date. In the light of how plaintiff alleged the breach of contract claim in the complaint,[12] the trial court was required to deny defendants' motion for a directed

---

[12] Plaintiff alleged, in relevant part:

"OIA and defendants entered into a contract in which defendants specifically agreed to prepare and provide notice of termination of the lease in a timely manner, as requested by OIA. The parties exchanged mutual promises in consideration of the contract.

"* * * * *

"Under the contract, OIA has performed all conditions precedent on its part to be performed, or performance is excused.

"* * * * *

"Defendants breached the contract by failing to prepare and provide notice of termination of the lease in a timely manner.

"* * * * *

"As a result of defendants' breach, OIA (and [plaintiff] as OIA's assignee) has been damaged in the amount of $402,552, which it would not have paid to [Winthrop] had defendants performed their obligation under the contract, and in the amount of $34,965.42, which OIA reasonably and necessarily paid to Minnesota counsel for attorney fees and costs to settle the dispute caused by defendants' breach."

Although, as we explained earlier, this case does not involve any statute-of-limitation issues that required plaintiff to satisfy the *Securities-Intermountain* standards for pursuing a breach of contract claim, we note that plaintiff did allege that defendants contracted with plaintiff to perform a specific task—the timely filing of the notice of lease termination—that is "irrespective of the general standard of care."

verdict and submit the breach of contract claim to the jury if there was any evidence in the record from which a reasonable factfinder could find that defendants[13] had an express or implied contract with OIA "in which defendants specifically agreed to prepare and provide notice of termination of the lease in a timely manner, as requested by OIA," as well as evidence that defendants "breached the contract by failing to prepare and provide notice of termination of the lease in a timely manner." Viewed in the light most favorable to plaintiff, the record would permit a reasonable factfinder to find that OIA and defendants had an implied (if not an express[14]) contract under which defendants agreed to timely provide notice of termination of the lease. In an implied-in-fact contract, "the parties' agreement is inferred, in whole or in part, from their conduct." *Staley v. Taylor*, 165 Or App 256, 262, 994 P2d 1220 (2000) (citing *Restatement (Second) of Contracts* § 4 comment a (1979)). "The conduct that is relevant to the inference of assent is not limited to the parties' actions at the commencement of the alleged relationship." *Montez v. Roloff Farms, Inc.*, 175 Or App 532, 536-37, 28 P3d 1255 (2001). An implied-in-fact agreement arises "only where the natural and just interpretation of the acts of the parties warrants such conclusion." *Owen v. Bradley*, 231 Or 94, 103, 371 P2d 966 (1962). "Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement." *Staley*, 165 Or App at 262 n 6 (citations omitted).

---

[13] We note that plaintiff alleged the breach of contract claim against both defendant attorney and defendant law firm. Before this court, the parties have not argued that we should analyze the directed verdict on the breach of contract claim differently for each defendant; accordingly, for purposes of this appeal, we treat both defendants as if they are in an identical position with respect to the breach of contract claim. In so doing, we do not intend to foreclose any arguments on remand as to whether both defendants are truly proper defendants on the breach of contract claim; it is not readily apparent that plaintiff had a contract with both the individual defendant and with the law firm.

[14] An express contract is no different in legal effect from an implied-in-fact contract. *Staley v. Taylor*, 165 Or App 256, 262, 994 P2d 1220 (2000) (citing *Restatement (Second) of Contracts* § 4 comment a (1979)). "The only difference between them is the means by which the parties manifest their agreement." *Staley*, 165 Or App at 262. "In an express contract, the parties manifest their agreement by their words, whether written or spoken." *Id.* Accordingly, based on the e-mail correspondence alone between plaintiff and defendants, a reasonable factfinder potentially also could have found the existence of an express contract.

Here, plaintiff presented evidence of the following conduct: OIA, through its CFO, Sether, notified defendants that it wanted defendants to "[p]rovide official notice of intent to Terminate the Lease." As to that goal, OIA also told defendants that the notice should occur "ASAP." OIA provided defendants with a billing code, which indicated an intention to pay defendants for their services. Defendants immediately began working on the project, with knowledge that their task was to help OIA get out of the lease "ASAP," and a promise to "follow up * * * shortly." Ultimately, defendants did, in fact, prepare the termination notice, and then billed plaintiff for that service.

From that evidence of the course of conduct between OIA and defendants, a reasonable factfinder could find that OIA and defendants had an implied contract under which defendants agreed to send a timely notice of termination of contract and that defendants breached that agreement when they did not promptly send the notice of termination. The trial court therefore erred in granting defendants' motion for a directed verdict on the breach of contract claim.

We conclude further that the error requires reversal of the dismissal of the breach of contract claim. The court's ruling "substantially affect[ed]" plaintiff's rights because it resulted in the dismissal of a claim that should have been considered by the jury. We recognize that the erroneous grant of a directed verdict on a claim does not categorically require reversal; if the verdict on claims that were submitted to the jury demonstrates that the jury necessarily would have rejected one or more elements of the claim that was taken away from it, then we will not deem the erroneous grant of a directed verdict to have "substantially affect[ed]" the plaintiff's rights under ORS 19.415(2). *Piazza v. Dept. of Human Services*, 261 Or App 425, 437-39, 323 P3d 444, *rev den*, 355 Or 879 (2014); *A. G. v. Guitron*, 238 Or App 223, 234, 241 P3d 1188 (2010), *aff'd*, 351 Or 465, 268 P3d 589 (2011). Here, however, we have concluded that the trial court's erroneous admission of mediation communications requires reversal of the jury's verdict on the one claim that was submitted to it. Under those circumstances, we are

unable to conclude that the jury's verdict renders the erroneous grant of a directed verdict harmless.

Reversed and remanded.