Argued and submitted December 18, 2020, affirmed September 9, 2021

Kimberly J. Jacobsen SHERERTZ,
as guardian *ad litem* for William Cole Sherertz;
Kimberly J. Jacobsen Sherertz as the Personal
Representative of the Estate of William W. Sherertz; and
Kimberly J. Jacobsen Sherertz, as Trustee of
the William W. Sherertz Testamentary Trusts,
*Plaintiffs-Appellants,*

*v.*

BROWNSTEIN, RASK, SWEENEY,
KERR, GRIM, DESYLVIA & HAY, LLP,
dba Brownstein Rask,
*Defendant-Respondent.*

Multnomah County Circuit Court
130100793; A170762

498 P3d 850

Plaintiffs appeal a judgment dismissing their legal malpractice claims against defendant law firm, which arose from alleged negligence in estate planning work for the deceased. Plaintiffs are the personal representative of the deceased's estate, the guardian *ad litem* for the deceased's minor son Cole, and the trustee of a trust of which Cole is the primary beneficiary. As to the claims of all three plaintiffs, the trial court directed verdict for defendant at the close of plaintiffs' evidence on the ground that plaintiffs had failed to prove any damages as a matter of law. Plaintiffs challenge the directed verdict ruling on appeal, arguing that there was sufficient evidence for their claims to go to the jury. Defendant maintains that the trial court correctly directed verdict in its favor, either on the stated grounds or because the court was right for the wrong reason. *Held*: As to the estate's claim, the trial court did not err in directing verdict for defendant on the basis that no reasonable juror could award damages to the estate based on plaintiffs' evidence. As to Cole's and the trust's claims, the court was right for the wrong reason when it directed verdict for defendant, because the evidence was legally insufficient to establish that defendant made a promise to the deceased of a nature that would give rise to the necessary third-party beneficiary status for purposes of a legal malpractice claim.

Affirmed.

John A. Wittmayer, Judge.

Zachariah H. Allen argued the cause for appellants. Also on the briefs were Bonnie Richardson and Richardson Wright LLP.

Peter R. Mersereau argued the cause for respondent. Also on the brief were Blake H. Fry and Mersereau Shannon LLP.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

In this legal malpractice action related to estate planning, plaintiffs appeal a judgment dismissing their negligence claims against defendant law firm. Plaintiffs are Kimberly Sherertz in three capacities: as personal representative of the estate of William W. Sherertz (Estate), as guardian *ad litem* for William Cole Sherertz (Cole), and as trustee of the William W. Sherertz Testamentary Trusts (Trust).[1] At the close of plaintiffs' case, the trial court granted a directed verdict for defendant. Plaintiffs challenge that ruling on appeal. We affirm.[2]

## I.  FACTS

In reviewing a directed verdict, we view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party—in this case, plaintiffs—and determine whether any reasonable factfinder could find in their favor. *Yoshida's Inc. v. Dunn Carney Allen Higgins & Tongue*, 272 Or App 436, 443, 356 P3d 121 (2015), *rev den*, 358 Or 794 (2016). "A directed verdict is appropriate only if the moving party is entitled to judgment as a matter of law." *Id*. We state the facts accordingly.

William (Bill) Sherertz was the founder, CEO, president, and chairman of the board of Barrett Business Services (BBSI), a publicly traded staffing company. He married Kimberly Sherertz in 1997. Bill had four children—two daughters from a prior marriage, a daughter of Kimberly's whom Bill adopted, and a son Cole born in 2000.

Bill's largest asset was BBSI stock, which gave him a controlling interest in BBSI. The wealth advisers at Bill's bank advised him that, upon his death, his estate would generate a large estate tax bill, which would necessitate selling stock to pay taxes unless Bill took action to provide liquidity to the estate. Bill did not like the idea of selling stock and hoped that his family would want to keep the stock.

---

[1] All references to the "Trust" are to the Barrett Share Trust, which is the only testamentary trust that was funded. A different type of trust—an irrevocable life insurance trust—is discussed later and referred to as the "ILIT."

[2] Given our affirmance of the directed verdict ruling, we do not reach plaintiffs' second assignment of error.

Bill retained defendant law firm to prepare his estate plan, working primarily with Kirk Hay. At first, Bill planned to leave his BBSI stock to his children in equal shares. In 1999, defendant drafted a will under which Bill's three daughters would each receive a third of the stock. Cole was then born, and, in 2001, defendant prepared a new will under which Bill's four children would each receive a quarter of the stock. As for the estate's anticipated liquidity problem, in 2001, defendant set up an irrevocable life insurance trust (ILIT) that was the named beneficiary of a $10 million life insurance policy on Bill's life. BBSI agreed to pay the insurance premium under a "split dollar life insurance arrangement."[3] Bill's four children were named equal beneficiaries of the ILIT.

Plaintiffs' expert witness testified as to how an ILIT works to provide liquidity to an estate with substantial stock assets. Life insurance proceeds are exempt from estate taxes as long as they are not held or controlled by the decedent's estate. The settlor therefore establishes an ILIT, funded with sums sufficient to pay the life insurance premiums, and names the ILIT the beneficiary of the insurance policy. At the settlor's death, the life insurance proceeds—in this case, $10 million—flow into the ILIT to be administered for the benefit of the ILIT beneficiaries. At that point, the ILIT may provide liquidity to the estate by lending money to the estate (secured by the stock as collateral) or by buying stock from the estate. The ILIT trustee is a fiduciary, however, and must act in the ILIT's beneficiaries' best interests. If the beneficial interests under the will and the ILIT are sufficiently aligned, the trustee's obvious choice is to use the ILIT funds to provide liquidity to the estate. The ILIT provides money to the estate, the estate provides stock to the ILIT, and the two sides are eventually merged, pursuant to language in both instruments. *See* ORS 130.230. However, if the beneficial interests are not aligned, the duties to differing beneficiaries will prevent such an arrangement.

---

[3] In addition to paying Bill's life insurance premium, BBSI also took out its own $10 million life insurance policy on Bill, which could be used to buy stock from the estate if desired. It was in BBSI's interests to avoid a large sale of BBSI stock on the open market upon Bill's death, as such event could lower the value of BBSI stock.

Consistent with the foregoing explanation of how an ILIT provides liquidity to an estate, the settling documents that Hay prepared for Bill in 2001 gave the ILIT trustee discretion to use principal to buy BBSI stock from Bill's estate or to loan money to Bill's estate. They also permitted the ILIT trustee to engage in nominally imprudent transactions that would otherwise have to be avoided, such as investing heavily in a single volatile and thinly traded stock like BBSI stock.

Bill executed the 2001 ILIT documents, but he did not sign the 2001 will. And, in 2003, Bill changed his mind about leaving his BBSI stock to all four children and instead decided to leave it to Cole. Accordingly, defendant prepared a new will for Bill in 2003-04, which provided for all the BBSI stock to go into a testamentary trust upon Bill's death. Each of Bill's three daughters would receive annual $100,000 distributions from the trust (with cost-of-living increases and a cash-out option), but, upon the earlier of reaching age 25 or receiving an MBA degree, Cole would become the trustee, at which point he could liquidate the trust, cash out his sisters, and keep what remained.

On November 25, 2003, Hay sent a letter to Bill outlining changes and options for Bill's estate plan related to the new will that Hay was drafting. Among other things, Hay advised Bill that it was "unlikely" that his three daughters' shares of the ILIT funds could be used for estate taxes if Cole was the sole beneficiary of the stock:

> "The planning becomes critical because the [BBSI] shares passing to your children will be subject to tax and a significant amount of the shares will have to be redeemed or sold in order to raise capital to pay the tax.
>
> "The insurance proceeds in the Irrevocable Life Insurance Trust [(ILIT)] can be utilized to pay taxes, but if a child is not a beneficiary of the [BBSI] shares, then it is unlikely that use of the funds for taxes would be appropriate for that insurance trust beneficiary."

Hay concluded by asking Bill to call him to discuss "some of these variances to the will," so that they could finalize the will. There is no evidence of any further communications between Bill and Hay.

On May 12, 2004, the BBSI board of directors held a meeting. Due to a change in federal law, the split-dollar arrangement by which BBSI had previously agreed to pay Bill's life insurance premiums was no longer permitted. BBSI's CFO reminded the directors that the purpose of that arrangement had been to provide Bill's estate with sufficient liquidity to pay estate taxes, "thereby avoiding the necessity of his estate being forced to sell a significant number of shares of BBSI to generate sufficient cash to pay estate taxes." The board approved a new arrangement, whereby BBSI would pay an annual cash bonus to Bill that he would use to pay the life insurance premiums.[4]

On September 22, 2004, Bill signed the new will, which remained in effect for the remainder of his life.

In 2005, Hay wrote an internal memorandum to a colleague at defendant law firm, asking him to look at Bill's ILIT. Hay asked the colleague to explore options to channel the life insurance proceeds to the payment of estate taxes, rather than an equal distribution to the four ILIT beneficiaries:

> "Frank, please take a look at the terms of the Irrevocable Life Insurance Trust ("ILIT") and the terms and provisions of Bill Sherertz's Will and give me your recommendation on how we can channel the policy proceeds to the payment of taxes rather than an equal distribution of the proceeds to each of the four (4) children. Please note that under the Will, Cole receives by far, the largest share of the Barrett stock. The goal of the ILIT was wealth replacement to eliminate the necessity of selling Barrett's stock.

> "You and I have discussed this issue before and I believe we have two (2) alternatives: (i) terminate the ILIT and reapply for new insurance or (ii) transfer the insurance to a new trust.

> "I believe concerns relating to those two (2) alternatives are (i) that Bill may be uninsurable and (ii) the transfer for

---

[4] Similarly, the minutes of the BBSI board of directors' meeting of November 11, 2004, contain a reference to Bill's bonus being intended "to enable Mr. Sherertz to maintain in force insurance policies to provide the necessary liquidity to his estate to pay estate taxes instead of selling the corporation's shares, which sale could depress the stock price to the detriment of the corporation's shareholders."

value issues that could arise in the event of a sale of the policies to the second trust.

"Please explore the alternatives and give me your thoughts."

There is no evidence of any further discussions between Hay and the colleague.

In 2011, Bill died, leaving behind a substantial estate. His wife Kimberly, as personal representative of the Estate, looked to the ILIT for funds to pay the estate taxes. However, the ILIT trustee would not buy stock from the Estate or loan money to the Estate using the stock as collateral, because he owed fiduciary duties to all four ILIT beneficiaries (the four children) and only one of the ILIT beneficiaries, Cole, would come to own the BBSI stock. The ILIT trustee testified that, with the four beneficiaries, it was not prudent to invest the entirety of the ILIT's funds in a single company's stock. The ILIT trustee agreed that, hypothetically, if Cole was the sole beneficiary of the ILIT, then he (the trustee) would have agreed to buy $10 million of BBSI stock from the Estate or loan the Estate $10 million secured by BBSI stock.

Ultimately, Kimberly decided to sell all of the estate's BBSI stock to BBSI, which she did for $50 million. The Estate paid about $9 million in estate taxes and "substantial" administrative fees, leaving about $35 million, which was put into the testamentary trust.

In January 2013, Kimberly filed this action against defendant, alleging negligent acts and omissions in its estate planning work for Bill. She asserted negligence claims in three capacities: (1) as personal representative of the Estate; (2) as guardian *ad litem* for Cole; and (3) as trustee of the Trust.[5] The case went to trial in 2014. A jury found that defendant was not negligent, resulting in a judgment for defendant. *Sherertz v. Brownstein Rask*, 288 Or App 719, 721, 407 P3d 914 (2017) (*Sherertz I*). We reversed that judgment on appeal, based on a jury-instruction error. *Id*.

---

[5] In the original complaint, Kimberly also asserted a claim in her individual capacity, but she later dismissed that claim.

On remand, plaintiffs amended their complaint. They alleged that defendant was negligent in various ways, including by failing to prepare an estate plan that fulfilled Bill's intent; failing to prepare an estate plan that preserved all of the Estate's BBSI stock for Cole's benefit; and failing to modify the ILIT or create a new ILIT when Bill decided to leave all the BBSI stock in trust for Cole, so that the entire insurance proceeds could be used to pay estate taxes and costs.[6] They further alleged that such negligence caused $7.5 million in damages to plaintiffs, based on the difference between the $10 million that should have been available to the Estate from the ILIT to pay estate taxes (in their view) and the $2.5 million that was actually available for that purpose.

The case was tried again in 2019. At the conclusion of plaintiffs' case, defendant moved for a directed verdict on multiple grounds, two of which are relevant on appeal. First, defendant argued that there was no evidence of damages (an element of negligence), because the Estate received fair market value for the shares that it sold to pay taxes, and the Estate was going to have to pay those taxes regardless of the alleged negligence. Second, defendant argued that there was no evidence of a "duty" to Cole (another element of negligence). The trial court rejected the latter basis for directed verdict but agreed with the former basis, and it granted directed verdict for defendant on all three plaintiffs' claims. It then entered a general judgment for defendant.

Plaintiffs appeal, assigning error to the directed verdict for defendant. They argue that the evidence was legally sufficient to permit a jury to find in each plaintiff's favor. In response, defendant maintains that the trial court correctly directed verdict for it, because of the lack of evidence of damages or, alternatively, because the lack of evidence on the duty element made the trial court "right for the wrong reason."

---

[6] Plaintiffs also alleged that defendant was negligent in failing to advise Bill that the revised estate plan could not ensure preservation of all BBSI stock in trust for Cole; failing to remedy problems or advise Bill of the problems with the revised estate plan; failing to retain competent experts and consultants to advise defendant on Bill's estate plan; failing to identify or recognize problems with Bill's estate plan in a timely fashion; and failing to disclose avoidable problems with Bill's estate plan once they were known.

## II.  ANALYSIS

An action for legal malpractice is not significantly different from an ordinary negligence action. *Sherertz I*, 288 Or App at 722. "It is simply a variety of negligence in which a special relationship gives rise to a particular duty that goes beyond the ordinary duty to avoid a foreseeable risk of harm[.]" *Watson v. Meltzer*, 247 Or App 558, 565, 270 P3d 289 (2011), *rev den*, 352 Or 266 (2012). To prove legal malpractice, a plaintiff must prove the elements of (1) duty, (2) breach, (3) harm measurable in damages, and (4) a causal connection between the breach of duty and the harm. *Id.*; *see also Roberts v. Fearey*, 162 Or App 546, 549, 986 P2d 690 (1999) (duty becomes an element of negligence "when the plaintiff pleads damages based on purely economic losses").

A trial court may direct verdict for the defendant when there is insufficient evidence to sustain a claim as a matter of law. *McDonald v. U.S. National Bank*, 113 Or App 113, 115, 830 P2d 618, *rev den*, 314 Or 573 (1992). We review a directed verdict ruling for errors of law. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). As previously noted, in doing so, we view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, so as to determine whether any reasonable factfinder could have found in the nonmoving party's favor. *Yoshida's Inc.*, 272 Or App at 443.

### A.  *The Estate's Claim*

We begin with the Estate's claim. We agree with the trial court that plaintiffs' evidence was legally insufficient to prove damages to the Estate.

The Estate's theory of damages was that, if defendant had properly advised Bill, Bill would have changed the ILIT before his death,[7] such that the Estate would have had access to $10 million cash to pay estate taxes and costs, either by selling BBSI stock to the ILIT or by taking a loan from the ILIT secured by BBSI stock. Instead, because all four children were beneficiaries of the ILIT, whereas only

---

[7] Plaintiffs alleged that defendant was negligent in failing to modify the existing ILIT or create a new ILIT after Bill decided to leave all of the BBSI stock to Cole. We refer to both options as "changing" the ILIT.

Cole would ultimately inherit the BBSI stock, only $2.5 million was available from the ILIT to cover estate taxes, and the Estate had to sell $7.5 million worth of stock to generate the remaining funds needed.

The difficulty with that theory is that the Estate had to pay the estate taxes and costs regardless of where the money came from to do so, and the Estate received fair market value when it sold the BBSI stock. That is, to get the cash to pay estate taxes and administrative costs, the Estate could have done a variety of things, including sell stock to the ILIT or use stock as collateral to get a loan from the ILIT (if the ILIT trustee was willing), sell stock to BBSI (if BBSI was willing), sell BBSI stock publicly, pay down the tax debt over time, or a combination of things. In this case, with only $2.5 million cash available through the ILIT, the Estate chose to sell all of its BBSI stock to BBSI for $50 million, using a portion of the proceeds to pay approximately $9 million in estate taxes and to pay costs. Even if it was defendant's alleged negligence that put the Estate in the position of having to sell $7.5 million worth of BBSI stock to generate enough cash to pay taxes and costs, the Estate was always going to have to pay those taxes and costs. The Estate may have preferred not to sell any stock, but, because the Estate received fair market value for the stock, it did not suffer any monetary damages by selling the stock.

The trial court therefore did not err in directing verdict for defendant on the Estate's negligence claim.

B.   *Cole's Claim*

We next consider Cole's claim. We conclude that the trial court was correct to direct verdict for defendant on Cole's negligence claim against defendant, albeit right for the wrong reason.

Cole's theory of damages was that he personally received $7.5 million less as a beneficiary of the Trust than he would have if defendant had properly advised Bill. As plaintiffs put it, "if Bill had been properly advised to update his ILIT at the time he updated his will in 2004, Bill would have designated Cole as the sole residual beneficiary of the $10 million ILIT, an act that would have served the purpose Bill conceived it for."

        In ruling on defendant's directed verdict motion, the trial court viewed the evidence as sufficient to prove the duty element of negligence but insufficient to prove the damages element. Given the nature of the duty element in this context, the line between the two elements is somewhat fine, but, under existing case law, we view the evidentiary deficiency regarding Cole's claim as going more to the duty element than the damages element, and we therefore proceed directly to the duty element.

        In doing so, we note as a preliminary matter that defendant relies on the "right for the wrong reason" principle to defend the trial court's directed verdict ruling. In response, Cole suggests that we must evaluate whether the prerequisites for consideration articulated in *Outdoor Media Dimensions, Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001), have been met and, if so, whether to exercise discretion to consider the alternative basis to affirm. That is incorrect. When an issue is raised for the first time on appeal, certain criteria must be met to even consider it—including whether the record would have developed differently had it been raised in the trial court—and then it is still discretionary whether to affirm on that basis. *Id.*; *Biggerstaff v. Board of County Commissioners*, 240 Or App 46, 56, 245 P3d 688 (2010). When an alternative argument was made in the trial court, however, the situation is different. If the argument is properly presented again on appeal and raises a question of law, we may simply resolve it, typically remanding only if it is necessary for the trial court to make factual findings from conflicting evidence, exercise discretion, or the like. *See State v. Lovaina-Burmudez*, 257 Or App 1, 14, 303 P3d 988, *rev den*, 354 Or 148 (2013).[8] Here, defendant moved for directed verdict on two rationales, either of which would, if

---

[8] We recognize that we have occasionally been inconsistent in our citations to *Outdoor Media* and take this opportunity to clarify that, on its face, the *Outdoor Media* approach applies when an issue is raised for the first time on appeal. Not only was that the situation in *Outdoor Media*, but that premise is built into the *Outdoor Media* standard itself, which requires that "the record materially be the same one that would have been developed *had the prevailing party raised the alternative basis for affirmance below.*" 331 Or at 660 (emphasis added). If an alternative argument was made to the trial court, it is up to the party whether to continue pursuing it on appeal, whereas, if a party wishes to make a new argument for the first time on appeal, it must convince us that the *Outdoor Media* prerequisites are met and persuade us to exercise our discretion.

legally correct, support a directed verdict for defendant on Cole's negligence claim, and both of which present questions of law.

Turning to the merits, as previously described, the elements of a legal malpractice claim are (1) duty, (2) breach, (3) harm measurable in damages, and (4) a causal connection between the breach of duty and the harm. *Watson*, 247 Or App at 565. Regarding the duty element, a defendant is not ordinarily liable in negligence for causing purely economic losses to a stranger. *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987). A special relationship—such as "attorney-client, architect-client, agent-principal, and similar relationships where the professional owes a duty of care to further the economic interests of the 'client'"—is necessary to permit liability for purely economic losses. *Roberts*, 162 Or App at 549-50. The client in such a relationship is typically the one to whom a duty is owed. For example, "an attorney ordinarily is not liable to those outside of the attorney-client relationship because there is no obligation to protect anyone outside of the attorney-client relationship from economic losses." *Id*. at 550.

In *Hale*, however, the court rejected the view that a lawyer can never be sued for legal malpractice by someone other than the lawyer's client. 304 Or at 283 (describing the issue as one of first impression). The court held that the plaintiff could pursue claims for purely economic losses against the attorney who prepared a decedent's will, specifically a breach-of-contract claim "as the intended beneficiary of defendant's professional contract with the decedent" and "a derivative tort claim [for negligence] based on breach of the duty created by that contract to the plaintiff as its intended beneficiary." *Id*. Because the plaintiff in *Hale* was "'a classic intended third-party beneficiary' of the attorney's promise to his client to include the plaintiff in [the client's] will," the plaintiff could prove the duty element. *Lord v. Parisi*, 172 Or App 271, 276-77, 19 P3d 358, *rev den*, 332 Or 250 (2001) (quoting *Hale*, 304 Or at 286).

Thus, in a legal malpractice action, the plaintiff must prove the existence of a duty to the *plaintiff*—even if the plaintiff was not the lawyer's client, as will frequently

be the case in the estate planning context, where alleged errors often come to light after the client is deceased. *Id*.; *Sherertz I*, 288 Or App at 723. And, critically, as *Hale* and its progeny emphasize, the relevant inquiry is *not* whether it was foreseeable that a third party could be harmed by the attorney's negligence, but instead whether the nature of the attorney's promise to the client gave rise to a duty to a third party. *Lord*, 172 Or App at 276-79; *see also Hale*, 304 Or at 284 ("Some source of a duty outside the common law of negligence is required," and "[i]t does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to" the client.); *Roberts*, 162 Or App at 550 ("[A] particular source for the duty to protect from economic losses is required even if economic losses are a foreseeable consequence of a defendant's conduct.").

Here, Cole relied on a third-party beneficiary theory to try to prove that defendant had a duty not only to Bill but to *him*, arising from a promise made to Bill. In Cole's view, there is evidence that defendant promised Bill that it would set up an estate plan under which all of the estate taxes could be paid with $10 million of life insurance proceeds funneled through the ILIT, thus avoiding any need to sell BBSI stock to pay taxes. Cole particularly points to Hay's 2005 internal memorandum, which mentions that the "goal" of the ILIT "was wealth replacement to eliminate the necessity of selling [BBSI] stock," and to other evidence about the purpose of the ILIT being to provide liquidity to cover taxes. In Cole's view, that was sufficient to prove a duty to Cole.

Defendant disagrees. It argues that, even if it breached the standard of care by not advising Bill to make changes to the ILIT after 2003 (as it acknowledges a jury could find), there is no evidence of a promise to Bill of a type that would create the requisite duty to Cole as a third-party beneficiary under *Hale* and its progeny.

Under *Hale*, it is not enough to support a negligence claim by Cole that defendant's alleged negligence could have a "foreseeable" consequence for Cole. *Lord*, 172 Or App at 277. Nor can Cole rely on defendant having implicitly promised to meet the standard of care for estate planning, which, in Cole's view, would have included advising Bill to change

the ILIT after Bill decided to leave all of his BBSI stock to Cole.

To support a negligence claim by a third-party beneficiary, a "lawyer's promise must be *more specific* than a general obligation to use his or her best professional efforts with the skill and care customary among lawyers in the relevant community; the lawyer must have agreed to accomplish *specific results or objectives* for the client." *Deberry v. Summers*, 255 Or App 152, 159, 296 P3d 610 (2013) (emphases added); *see also Sherertz I*, 288 Or App at 724 ("[U]nder *Hale* and our subsequent cases, the facts surrounding a lawyer's alleged promised result to a client become the central point of inquiry."); *Frakes v. Nay*, 254 Or App 236, 267, 295 P3d 94 (2012), *rev den*, 353 Or 747 (2013) ("Standing alone, an attorney's promise to the testator to use the skill and care customary among lawyers in the relevant community is not a promise to obtain *a particular result* for the plaintiff's benefit that will support a third-party negligence claim for financial loss." (Emphasis added.)).

In *Hale*, 304 Or at 283, 288, there was evidence of a specific enough promise to give rise to a duty to the plaintiff, where the client specifically directed her attorney to include a $300,000 bequest to the plaintiff in her testamentary instruments, and the attorney failed to do so. And, in *Frakes*, 254 Or App at 268, it was "a close question," but there was sufficient evidence that the defendant attorney had "promised to obtain a particular result" for his client, which was to create an estate plan that would carry out the client's intent to leave nearly all of her estate to her nephew, the plaintiff, whom she had raised since age 12.

By contrast, in *Deberry*, 255 Or App at 154-56, the evidence was legally insufficient to prove the duty element of legal malpractice, where the client directed her attorney to amend a trust document so that the plaintiff (her granddaughter) would receive the "Canyon Court" property upon her death, the attorney did so, the client later sold the Canyon Court property, and no changes were made to the trust to provide for the plaintiff to receive a different property. Although there was evidence that the client had *wanted* and even intended for the plaintiff to receive a replacement

property, there was no evidence that she had ever directed her attorney to take steps to achieve that result. *See id.* at 155-56, 166-67. The attorney's only actual promise (express or implied) had been to effectuate the client's desire to leave the Canyon Court property to the plaintiff—and the attorney fulfilled that promise. *Id.* Because there was no evidence of a promise for the plaintiff's benefit regarding a different property, the duty element could not be proved, and the defendant was entitled to judgment as a matter of law. *Id.* at 167.

Thus, to summarize, to give rise to a duty to a third-party beneficiary, an attorney must make an *actual promise* to the client, either express or implied, to achieve a *particular objective* that will benefit a *specified third party*. An objective that was not communicated to the attorney or that was not specific enough will not give rise to a duty to a third party. As we said in *Deberry*:

> "Whether defendant *should have* undertaken a particular obligation (such as including a 'simple phrase' in a trust or will) is different, however, from whether he *in fact* undertook that obligation. Because plaintiff is not a party to the contract between defendant and his client, plaintiff cannot rely on implicit promises or duties that arise from the standard of care exercised in the legal community. Instead, plaintiff must establish a basis in fact or in law—*independent of the professional standard of care*—for the implication that defendant promised to include a provision in her grandmother's trust or will that would ensure that plaintiff obtained the Canyon Court house or any replacement home. Plaintiff did not carry that burden on summary judgment, and the court correctly granted summary judgment on her claims."

*Id.* at 169 (emphases in original).[9]

---

[9] *See also Lord*, 172 Or App at 278 ("[T]he question is whether 'the principal purpose of the attorney's retention is to provide legal services for the benefit of the plaintiff. Often, the attorney's retention will benefit another. The inquiry, however, is did the attorney and the client intend the plaintiff to be the beneficiary of the legal services.'" (Quoting Ronald E. Mallen and Jeffrey M. Smith, *Legal Malpractice* § 7.13, 532-33 (4th ed 1996).) (Internal ellipses and brackets omitted.)); *Restatement (Third) of the Law Governing Lawyers* § 51 comment f (2000) ("A duty to a third person hence exists only when the client intends to benefit the third person as one of the primary objectives of the representation * * *. Without adequate evidence of such an intent, upholding a third person's

With those principles in mind, the question in this case is whether there is any evidence that defendant undertook an obligation to Bill to make $10 million available to the Estate through the ILIT *for Cole's benefit*, such that Cole became a third-party beneficiary of that promise for his benefit. Upon review of the record, the answer is no.

In 2001, viewing the record and all reasonable inferences in the light most favorable to Cole, defendant performed the exact obligation that it undertook. It drafted a will that provided for each of Bill's four children to share equally in his estate, including his BBSI stock, and it set up an ILIT that would effectively provide $2.5 million toward the estate taxes on each child's inheritance. Given the volatility of BBSI stock, that amount might or might not cover all of the taxes, but each child would rightfully expect a $2.5 million benefit from the ILIT, based on Bill's estate plan in 2001 and defendant's promise to effectuate that plan. And, presumably, at that point in time, defendant had a duty to each of the four children to set up the ILIT in that way, given the specific obligation that it undertook and the specific benefit to each of the four children.

In other words, defendant decidedly did not promise Bill in 2001 that it would undertake to set up the ILIT in such a way that *Cole* would receive a $10 million benefit from the ILIT. *See Deberry*, 255 Or App at 161 (explaining that, under *Hale* and its progeny, "an essential element of a *** negligence claim by a nonclient plaintiff against an attorney who prepared a testamentary instrument is the existence of a promise by the attorney—either express or implied—to include specific provisions to satisfy certain objectives of the client *for the benefit of the plaintiff*" (emphasis added)).[10] Indeed, had defendant taken steps to achieve

---

claim could expose lawyers to liability for following a client's instructions in circumstances where it would be difficult to prove what those instructions had been. Threat of such liability would tend to discourage lawyers from following client instructions adversely affecting third persons.").

[10] *See also Frakes*, 254 Or App at 267 ("To sustain a negligence claim for financial loss, a plaintiff who is not a party to the contract between the defendant attorney and the testator must prove (1) that the attorney actually made an express or implied promise to the testator (2) under circumstances that indicate that the testator intends to give *the plaintiff* the benefit of the promised performance." (Emphasis added.)).

such a result in 2001, it would have been contrary to what it promised Bill in 2001 and contrary to what it undertook to do in 2001. It follows that, to the extent that Cole is relying on defendant's promises to Bill in 2001 to support his claim, he cannot prove the duty element, because there is no evidence that defendant promised in 2001 to set up the ILIT so as to provide a $10 million benefit *to Cole*.

That brings us to the period after 2003, when Bill changed his mind and decided to leave all of his BBSI stock to Cole. At that point, Bill could have directed defendant to change the ILIT so that all $10 million of life insurance proceeds would be available for Cole's benefit, instead of each of Bill's children receiving a $2.5 million benefit. However, there is no evidence that Bill ever gave that direction to defendant—in 2003, 2004, or at any time before his death in 2011.

As previously explained, to give rise to a duty to a third-party beneficiary, an attorney must make an actual promise to the client, either express or implied, to achieve a particular objective that will benefit a specified third party. Viewing the record in the light most favorable to Cole, a jury could find that, to meet the standard of care, once Bill changed his mind about his will and decided in 2003 to leave all of his BBSI stock to Cole, defendant *should have advised Bill* to make changes to the ILIT if he wanted Cole to receive the entire $10 million benefit from the ILIT. A jury also could find on this record that defendant never gave such advice to Bill, thus breaching the standard of care.[11] But a jury could not find on this record that defendant ever actually promised Bill—expressly or implicitly—that it would change the ILIT for Cole's benefit in light of the 2004 will. *See Frakes*, 254 Or App at 267 (requiring the plaintiff to prove "that the attorney actually made an express or implied promise to the testator"). There is simply no evidence of any such promise. At most, there is evidence that defendant *should have* given Bill advice that *might* have resulted in defendant

---

[11] The jury heard some evidence that defendant *did* advise Bill about changing the ILIT in 2004 or 2005—Hay claimed as much in a portion of his deposition video that was played during plaintiffs' case—but the jury could have discredited that evidence. For present purposes, we view the evidence in the light most favorable to Cole.

making such a promise, depending on Bill's response to the advice, but that conversation never occurred. *See Deberry*, 255 Or App at 169 ("Whether defendant *should have* undertaken a particular obligation (such as including a 'simple phrase' in a trust or will) is different, however, from whether he *in fact* undertook that obligation." (Emphases in original.)).

The existence of an actual promise is the "central point of inquiry" under *Hale* and its progeny, *Sherertz I*, 288 Or App at 724, because it is the source from which any duty to a third party arises. Without defendant actually promising Bill that it would change the ILIT to give Cole a $10 million benefit, there necessarily can be no finding of a duty to Cole as a third-party beneficiary of that promise. *See Hale*, 304 Or at 283-84; *Sherertz I*, 288 Or App at 724; *Deberry*, 255 Or App at 159; *Frakes*, 254 Or App at 267. The duty arises from the specific promise that was made.

In *Deberry*, 255 Or App at 155-57, 169, for example, where the defendant attorney promised his client that he would arrange for the plaintiff to receive the client's "Canyon Creek" property upon the client's death, the defendant's only duty to the plaintiff was to fulfill that specific promise. The nonmoving party is entitled to all reasonable inferences from the evidence, but that does not mean inferring a promise *different* from the one that was actually made. Thus, in *Deberry*, we would not infer a promise different from the one that was made, such as a promise to arrange for the plaintiff to receive the Canyon Creek home *or any home purchased to replace it*, or a promise to arrange for the plaintiff to receive *the house where the client was living when she died*, or a promise to *confer a benefit on the plaintiff. Id*. at 161-62, 164-67 (demonstrating the limits of "reasonable inferences" when implying promises giving rise to third-party beneficiary status).

On this record, with respect to the ILIT, the only evidence of defendant making an express or implied promise to Bill to do something *for Cole's benefit* was defendant's promise in 2001 to set up an ILIT of which Cole would be a one-quarter beneficiary, thus giving Cole the benefit of $2.5 million of Bill's insurance policy.

Accordingly, the trial court was correct to grant directed verdict for defendant on Cole's negligence claim, albeit right for the wrong reason. Cole's claim depended on defendant having a duty *to Cole* to set up an ILIT that would provide $10 million for his benefit, and the evidence was legally insufficient to prove such a duty.

C.  *The Trust's Claim*

That leaves the Trust's negligence claim against defendant.

We must first address a procedural issue that exists only as to the Trust's claim. In arguing for a directed verdict at trial, defendant described its duty argument as being "directed at Cole's claim," without expressly mentioning the Trust's claim. Plaintiff contends that we should not consider defendant's duty argument with respect to the Trust's claim, because it is being made for the first time on appeal. In context, and given the relationship between Cole and the Trust, the trial court likely would have understood defendant's argument regarding the duty element of negligence to apply to both Cole's and the Trust's claims. In any event, as to the Trust's claim, even if we were to conclude that defendant is making a new argument for the first time on appeal (as to this one plaintiff), the *Outdoor Media* criteria are met in these particular circumstances,[12] and we would exercise our discretion to affirm the trial court's directed verdict ruling on the Trust's claim on the alternative basis.

On the merits, the Trust's claim was identical to Cole's claim. Both claims pertain to Cole's inheritance from his father, which passes through the Trust. We affirm the trial court's directed verdict for defendant on the Trust's claim for the same reasons as the directed verdict on Cole's claim.

Affirmed.

_____

[12] A directed verdict ruling presents a pure question of law and does not depend on any factual findings. As to the evidentiary record, because of the relationship between Cole and the Trust, the evidence was the same as to both claims, and there is no reason to believe that, had defendant clearly stated that its duty argument was directed at Cole's *and the Trust's* claims, plaintiffs would have sought to reopen the record to put on additional evidence relevant to the Trust's claim.